RECORD NO. 10-4456

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

OPIO DIARRA MOORE,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THE HONORABLE ROGER W. TITUS, USDJ, PRESIDING

**OPENING BRIEF OF APPELLANT**
**OPIO DIARRA MOORE**

Michael E. Lawlor
Gwendolyn R. Waters
LAWLOR & ENGLERT, LLC
6305 Ivy Lane, Suite 608
Greenbelt, Maryland 20770
(301) 474-3404 Telephone
mlawlor@verizon.net
gwaters@lawlor-englert.com

*Counsel for Appellant*                    January 18, 2011

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**ISSUES PRESENTED FOR REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATEMENT OF THE FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**SUMMARY OF ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.   THE LOWER COURT ERRED IN ADMITTING EVIDENCE FOUND
     PURSUANT TO A STOP AND SEARCH NOT SUPPORTED BY
     PROBABLE CAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.  THE LOWER COURT ERRED IN INCREASING APPELLANT'S
     SENTENCE FROM THE GUIDELINE RANGE TO LIFE IMPRISONMENT
     BASED SOLELY ON FACTS NOT FOUND BY A JURY IN VIOLATION
     OF THE SIXTH AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III. THE LOWER COURT ERRED IN INCREASING APPELLANT'S
     SENTENCE FROM THE GUIDELINE RANGE TO LIFE IMPRISONMENT
     BASED SOLELY ON FACTS NOT FOUND BEYOND A REASONABLE
     DOUBT IN VIOLATION OF THE FIFTH AMENDMENT. . . . . . . . . . 28

IV.  APPELLANT'S SENTENCE IS PROCEDURALLY AND
     SUBSTANTIVELY UNREASONABLE UNDER *BOOKER* . . . . . . . . . 35

     A.   THE LOWER COURT COMMITTED PROCEDURAL ERROR
          WHEN IT FAILED TO CONNECT APPELLANT'S VARIANT
          SENTENCE TO THE FACTORS SET OUT IN 18 U.S.C. § 3553(a) 35

B.    THE LOWER COURT ERRED WHEN IT BASED APPELLANT'S VARIANT SENTENCE ON CONDUCT UNRELATED TO HIS CONVICTION THAT DID NOT MEET THE PREPONDERANCE OF THE EVIDENCE STANDARD . . . . . . . . . . . . . . . . . . . . . . . . 39

V.    THE LOWER COURT COMMITTED OTHER PROCEDURAL ERRORS THAT DENIED APPELLANT RIGHTS GUARANTEED TO HIM BY THE FIFTH AND SIXTH AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . 43

A.    THE LOWER COURT ERRED IN DENYING APPELLANT THE RIGHT TO REVIEW SUBPOENAED DOCUMENTS PRIOR TO SENTENCING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

B.    THE LOWER COURT ERRED IN CONSIDERING TESTIMONIAL HEARSAY AT SENTENCING IN VIOLATION OF APPELLANT'S CONFRONTATION CLAUSE RIGHTS . . . . . . . . . . . . . . . . . . . 49

C.    THE LOWER COURT ERRED IN CONSIDERING UNRELIABLE HEARSAY TESTIMONY AT SENTENCING IN VIOLATION OF APPELLANT'S DUE PROCESS RIGHTS . . . . . . . . . . . . . . . . . 53

VI.    THE LOWER COURT ERRED IN SENTENCING APPELLANT AS AN ARMED CAREER CRIMINAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

CERTIFICATE OF FILING AND MAILING . . . . . . . . . . . . . . . . . . . . . . 63

ADDENDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

## TABLE OF CASES, STATUTES, AND AUTHORITIES

### CASE LAW

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998) . . . . . . . . . . . . . 58, 59

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Blakely v. Washington*, 542 U.S. 296 (2004) . . . . . . . . . . . . . . . . . . . . . . 22, 23, 59

*California v. Trombetta*, 467 U.S. 469 (1984) . . . . . . . . . . . . . . . . . . . . . . . . 43

*Coffin v. United States*, 156 U.S. 432 (1895) . . . . . . . . . . . . . . . . . . . . . . . . 29

*Crawford v. Washington*, 521 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . . . 49, 50, 51

*Cunnigham v. California*, 549 U.S. 270 (2007) . . . . . . . . . . . . . . . . . . . . . . . . 24

*Davis v. Alaska*, 415 U.S. 308, 316 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Douglas v. Alabama*, 380 U.S. 415 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Gall v. United States*, 552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 40

*Giles v. California*, 554 U.S. 353 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Hamling v. United States*, 418 U.S. 87 (1974) . . . . . . . . . . . . . . . . . . . . . . . 58

*Herrera v. Collins*, 506 U.S. 390 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Martin Marietta Corp.*, 856 F.2d 619 (4th Cir. 1988) . . . . . . . . . . . 43, 47, 48

*In re Winship*, 397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Jones v. United States*, 526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 58

iii

*McMillan v. Pennsylvania*, 477 U.S. 79 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Ornelas v. United States*, 517 U.S. 690 (1983) . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rita v. United States*, 551 U.S. 351 (2007) . . . . . . . . . . . . . . . . . . . . . . . . 36, 40

*Shepard v. United States*, 544 U.S. 13 (2005) . . . . . . . . . . . . . . . . . . . . . . . . 59

*Taylor v. Alabama*, 457 U.S. 687 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Booker*, 543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . 23, 24, 27, 40

*United States v. Brika*, 487 F.3d 450 (6th Cir.  2007) . . . . . . . . . . . . . . . . . . . . 30

*United States v. Brookins*, 345 F.3d 231 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . 17

*United States v. Brown*, 401 F.3d 588 (4th Cir. 2005) . . . . . . . . . . . . . . . . . *passim*

*United States v. Cammisano*, 917 F.2d 1057 (8th Cir. 1990) . . . . . . . . . . . . . . . 55

*United States v. Davis*, 602 F.Supp.2d 658 (D. Md. March 16, 2009) . . . . . . *passim*

*United States v. Fennell*, 65 F.3d 812 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . 54

*United States v. Fisher*, 502 F.3d 293 (3rd Cir. 2007) . . . . . . . . . . . . . . . . . . . . 30

*United States v. Gooding*, 695 F.2d 78 (4th Cir. 1982) . . . . . . . . . . . . . . . . . . . 20

*United States v. Grubbs*, 585 F.3d 793 (4th Cir. 2009) . . . . . . . . . . . . . . . 30, 31

*United States v. Hampton*, 441 F.3d 284 (4th Cir. 2006) . . . . . . . . . . . . . . . . . 53

*United States v. Hicks*, 948 F.2d 877 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . 54

*United States v. Ibarra-Sanchez*, 199 F.3d 753 (5th Cir. 1999) . . . . . . . . . . . . . 20

*United States v. Johnson*, 599 F.3d 339(4th Cir. 2010) . . . . . . . . . . . . . . . . 17, 19

iv

*United States v. Kelly*, 592 F.3d 586 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Kikumura*, 918 F.3d 1084 (3rd Cir. 1990) . . . . . . . . . . . . . . . . . 29

*United States v. Mackins*, 315 F.3d 399 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . 57

*United States v. Mendenhall*, 446 U.S. 544 (1980) . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Mora*, 623 F. Supp. 354 (D. Mass. 1985) . . . . . . . . . . . . . . . . . 44

*United States v. Myers*, 280 F.3d 407 (4th Cir. 2002) . . . . . . . . . . . . 21, 28, 43, 49

*United States v. Nixon*, 418 U.S. 683 (1974) . . . . . . . . . . . . . . . . . . . . . . . 43, 44, 47

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) . . . . . . . . . . . . . . . . . 35, 40

*United States v. Pitts*, 176 F.3d 239 (4th Cir. 1999) . . . . . . . . . . . . . 21, 28, 43, 49

*United States v. Raby*, 2009 WL 5173964 (S.D.W.Va.) . . . . . . . . . . . . . . . . . 26, 27

*United States v. Raineri*, 670 F.2d 702 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . 44

*United States v. Roberts*, 881 F.2d 95 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Simons*, 206 F.3d 392 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . 16

*United States v. Weaver,* 282 F.3d 302 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 17

*United States v. Wise*, 976 F.2d 393 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . 54

*Williams v. New York*, 337 U.S. 241 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Wong Sun v. United States*, 371 U.S. 471(1963) . . . . . . . . . . . . . . . . . . . . . 18, 21

## STATUTES AND RULES

8 U.S.C. § 1326 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 61

18 U.S.C. § 922 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 61

18 U.S.C. § 924 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 36, 60

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3661 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Federal Rule of Criminal Procedure 17 . . . . . . . . . . . . . . . . . . . . . . . . . 44

## CONSTITUTIONAL PROVISIONS

United States Constitution, Fourth Amendment . . . . . . . . . . . . . . . . . . . . . *passim*

United States Constitution, Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . *passim*

United States Constitution, Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . *passim*

## OTHER AUTHORITY

U.S.S.G. § 6A1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

**No. 10-4456**

_____

## UNITED STATES OF AMERICA,

### Appellee,

### v.

## OPIO DIARRA MOORE

### Appellant.

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## (JUDGE ROGER W. TITUS, PRESIDING)

_____

## APPELLANT'S BRIEF

_____

## STATEMENT OF SUBJECT MATTER JURISDICTION

The district court had jurisdiction in this case pursuant to 18 U.S.C. § 3231 and imposed sentence on April 22, 2010. A notice of appeal was timely filed on April 23, 2010, J.A. 587, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.[1]

_____

[1] J.A. denotes "Joint Appendix," citations to which shall be followed by the appropriate page number.

1

## ISSUES PRESENTED FOR REVIEW

I.    DID THE LOWER COURT ERR IN ADMITTING EVIDENCE FOUND PURSUANT TO A STOP AND SEARCH NOT SUPPORTED BY PROBABLE CAUSE?

II.   DID THE LOWER COURT ERR IN INCREASING APPELLANT'S SENTENCE FROM THE GUIDELINE RANGE TO LIFE IMPRISONMENT BASED SOLELY ON FACTS NOT FOUND BY A JURY IN VIOLATION OF THE SIXTH AMENDMENT?

III.  DID THE LOWER COURT ERR IN INCREASING APPELLANT'S SENTENCE FROM THE GUIDELINE RANGE TO LIFE IMPRISONMENT BASED SOLELY ON FACTS NOT FOUND BEYOND A REASONABLE DOUBT IN VIOLATION OF THE FIFTH AMENDMENT?

IV.   IS APPELLANT'S SENTENCE PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE UNDER *BOOKER*?

      A.    DID THE LOWER COURT COMMIT PROCEDURAL ERROR WHEN IT FAILED TO CONNECT APPELLANT'S VARIANT SENTENCE TO THE FACTORS SET OUT IN U.S.S.G. § 3553(a)?

      B.    DID THE LOWER COURT ERR WHEN IT BASED APPELLANT'S VARIANT SENTENCE ON CONDUCT UNRELATED TO HIS CONVICTION THAT DID NOT MEET THE PREPONDERANCE OF THE EVIDENCE STANDARD?

V.    DID THE LOWER COURT COMMIT OTHER PROCEDURAL ERRORS THAT DENIED APPELLANT RIGHTS GUARANTEED TO HIM BY THE FIFTH AND SIXTH AMENDMENTS?

      A.    DID THE LOWER COURT ERR IN DENYING APPELLANT THE OPPORTUNITY TO REVIEW SUBPOENAED MATERIALS PRIOR TO SENTENCING?

2

B.   DID THE LOWER COURT ERR IN CONSIDERING TESTIMONIAL HEARSAY AT SENTENCING IN VIOLATION OF APPELLANT'S CONFRONTATION CLAUSE RIGHTS?

C.   DID THE LOWER COURT ERR IN CONSIDERING UNRELIABLE HEARSAY TESTIMONY AT SENTENCING IN VIOLATION OF APPELLANT'S DUE PROCESS RIGHTS?

VI.   DID THE LOWER COURT ERR IN SENTENCING APPELLANT AS AN ARMED CAREER CRIMINAL?

## STATEMENT OF THE CASE

On April 28, 2008, a grand jury in the District of Maryland returned an indictment charging Mr. Opio Moore (hereafter the Appellant or Mr. Moore) with being a felon in possession of ammunition, pursuant to 18 U.S.C. § 922(g)(1), and conspiring to be a felon in possession of ammunition, pursuant to 18 § U.S.C. 371.

On November 26, 2008, a hearing was held on Mr. Moore's Motion to Suppress evidence found during a search of his vehicle, at the close of which the district court denied the Motion. On December 5, 2008, after a four-day trial before United States District Judge Roger W. Titus and a sitting jury, Mr. Moore was found guilty of being a felon in possession of ammunition; and guilty of conspiring to be a felon in possession of ammunition. On April 22, 2010, the district court sentenced Mr. Moore to life in prison for count one, and to sixty months' imprisonment for count 2, to be served concurrently to the sentence imposed for count one. Mr. Moore

filed a timely notice of appeal on April 23, 2010, and now appeals his convictions and sentence.

## STATEMENT OF FACTS

I.      Motion to Suppress Evidence

Prior to trial, Mr. Moore filed a Motion to Suppress ammunition found in his vehicle asserting that officers lacked probable cause to stop and search his vehicle. J.A. 13.  Special Agent Jeffrey McLoughlin (hereafter "McLoughlin") of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (herefafter "ATF"), was the sole witness at the suppression hearing held on November 26, 2008.  At the time of Mr. Moore's stop and arrest on August 30, 2006, McLoughlin, and his task force were conducting surveillance of the Realco gun store in Maryland. J.A. 30.  On that date, he observed a minivan, driven by a black female, pull into the Realco parking lot, and a Jeep Cherokee, driven by a black male, pull into an adjacent parking lot. J.A. 32. The two drivers conversed before the female driver entered Realco. *Id.*   Later, the female driver of the minivan exited the store carrying a black bag with a heavy square object in it. *Id.* McLouglin and his team followed the vehicles into a parking lot approximately one mile from Realco, where the male driver exited the Jeep and appeared to hand currency to the female driver in exchange for a black bag. *Id.* McLoughlin and his team followed the male driver in the Jeep until they initiated a

4

traffic stop in the District of Columbia. J.A. 36-37. The driver tossed his keys out of the window as instructed by law enforcement, was immediately handcuffed, and identified himself as Mr. Moore. J.A. 57. Law enforcement officials searched Mr. Moore's vehicle without his consent, and after he was handcuffed. A box of ammunition was recovered from underneath the backseat of the Jeep. J.A. 38.

Mr. Moore argued that the officers had only a hunch that there was ammunition in the bag, and did not know if he was permitted to have ammunition in the District of Columbia. J.A. 59-61. The court disagreed, found that there was adequate probable cause for the stop, and denied the Motion to Suppress. J.A. 65.

II.    Trial

At trial, on December 2, 2008, before the district court and a jury, McLoughlin testified to substantially the same facts as he had at the motions hearing. After two other officers testified consistently with the testimony of McLoughlin, the government rested it case. J.A. 220. Mr. Moore made a motion for judgment of acquittal submitting on the record, which the trial court denied. Mr. Moore presented his case, including two witnesses. Following their testimony, Mr. Moore renewed his motion for judgment of acquittal, which was again denied. On December 5, 2008, the jury returned from its deliberations, and announced that it found Mr. Moore guilty of both counts.

5

III.    Pre-Sentencing Motions Hearing

Over one year elapsed between the verdict and imposition of sentence in this case.[2]  On June 19, 2009, the government filed a sentencing memorandum wherein it alleged, based on information from confidential sources, that Mr. Moore was involved in murders, attempted murders, and other crimes unrelated to his conviction. JA. 622.  Based upon its allegations, the government requested that Mr. Moore be sentenced to life imprisonment. JA. 623.  On March 12, 2010, and March 25, 2010, the government provided the defense with discovery regarding the allegations, which included the names of the sources.[3]  Mr. Moore served five subpoenas requesting records relating to the government sources whose identities had been disclosed, and a hearing regarding those subpoenas was held on April 21, 2010. J.A. 806, 850-52. The district court received records from the District of Columbia Department of Corrections, J.A. 810, and the government received records from the United States Marshal Service. J.A. 811.  The court found the subpoenas improper, pursuant to Fed. R. Crim. P. 17(c), based on the following language added to the subpoena by counsel,

---

[2]  On August 12, 2009, prior to sentencing, Mr. Moore's trial counsel was replaced with the undersigned.

[3]  The names of the government's sources have not been made available to the public; several were not even disclosed to Mr. Moore.   The unnamed sources that testified were, in the transcript, and are now, referred to as Inmate One, and Inmate Two.

6

"[i]n lieu of appearing in person you may comply with this subpoena duces tecum by furnishing the requested information and/or records by mail by the requested date to the attorney listed on the subpoena." J.A. 813. The district court found that for Mr. Moore to have access to those materials, prior to sentencing, a court order was required. J.A. 815. Based on that finding, the court quashed the subpoenas, to the extent that they requested pre-trial production of materials. J.A. 817. Mr. Moore argued that given the time line of the case, and the allegations that the government sought to prove at sentencing, he should be permitted to investigate the government's allegations and witnesses. J.A. 820-21. He further asserted that his investigation was particularly important since he was denied a trial, discovery, due process, confrontation rights, and a heightened standard of proof with regard to the government's allegations. *Id.* In response, the court ruled that whether the defense was permitted to review the requested materials, depended on whether they were admissible at the sentencing hearing. J.A. 826. In turn, Mr. Moore argued that he could not present an argument as to admissibility absent a review the documents. *Id.* Finally, the court denied Mr. Moore's request for review, and for a continuance, but ordered the government to review the materials and disclose what it thought was material, or would fall under discovery obligations. *Id.*

IV.   <u>Sentencing</u>

On April 22, 2010, the subpoena matter was again addressed prior to the start of the sentencing hearing, and Mr. Moore requested that he be permitted to review the subpoenaed materials. J.A. 240.  Finding that the standard for pretrial review of the materials had not been met, the court denied a continuance for review of the materials. J.A. 261-262.

The court then turned to sentencing Mr. Moore,  and began by calculating his guidelines.  Finding that Mr. Moore was an armed career criminal, pursuant to 18 U.S.C. § 924(e), the court increased the base offense level from twenty-four to thirty-three, and his criminal history category to four. J.A. 267.   The court overruled Mr. Moore's objection that the jury had not determined the existence of three separate qualifying convictions, and determined the following: that the guideline range was 188-235 months (rather than 63-78 months); the statutory maximum for count one was life imprisonment; and the statutory maximum for count two was five years. *Id.*

Before the government began its presentation, Mr. Moore argued the following: the government's anticipated presentation violated his Sixth Amendment right to a jury trial; judicial fact finding should at least be subject to the reasonable doubt standard; the Rules of Evidence should apply; hearsay should be excluded; and that Mr. Moore's confrontation rights should be honored. J.A. 274-80.  The trial court

8

overruled Mr. Moore's objections, stating that while it did not intend to sentence Mr. Moore for the crime of murder, it would take that information into consideration. J.A. 279.

The government began by requesting that the court consider Mr. Moore's alleged involvement in the murder of Jason Schwindler. J.A. 282. The district court admitted into evidence the entire transcript, and all the trial exhibits from *United States v. Earl Davis*, a case over which the district court had also presided. J.A. 284. The essential facts of that case were summarized by the district court, in a pre-trial evidentiary memorandum opinion and order, as follows,

> On August 6, 2004, shortly before 1:00 p.m., Jason Schwindler, an armored car employee, picked up a bank deposit from a local business and took it to a nearby BB&T bank in Hyattsville, Maryland. Schwindler got out of the armored car, and as he walked up to the bank entrance, two gunman exited a Jeep Cherokee and began shooting at Schwindler, killing him.

*United States v. Davis*, 602 F.Supp.2d 658, 660 (D. Md. 2009). The government offered the following to support its allegation that Mr. Moore was involved in the murder: Mr Moore could not be included or excluded from DNA found at the scene of the crime, J.A. 292; Mr. Moore matches the physical characteristics of the second gunman, J.A. 293; two unnamed acquaintances said that the figure in a bank surveillance photograph looked like Mr. Moore, *id.*; Mr. Moore went on a shopping

9

trip with Mr. Davis after the armored truck robbery, J.A. 296; and Mr. Moore's correspondence to a federal inmate included an article about the robbery, and noted that Mr. Davis was not talking. J.A. 298.  The government also presented a video of a recorded visit between Mr. Moore and Mr. Davis at the Prince George's County Correctional Center, that Special Agent Casey Cox interpreted as an escape plan. J.A. 306.

Following the testimony of Agent Cox, the government called three other witnesses at Mr. Moore's sentencing.  Prior to testifying against Mr. Moore, Inmate One pleaded guilty in the United States District Court for the Eastern District of Virginia to conspiring to distribute heroin. J.A. 324.  In return for cooperating against Mr. Moore he hoped to receive a reduction from his twenty-six year sentence. J.A. 368. In addition to the Virginia conviction, Inmate One also admitted to other criminal convictions. J.A. 361.  During the time period in which Inmate One implicated Mr. Moore in criminal activity, Inmate One was using three to four grams of heroin per day, and his schizophrenia and bipolar disorder went untreated. J.A. 408-09.  In 2007 Inmate One was involved in the distribution of drugs that he received from his cousin, David Long. J.A. 329.  Long came to him and said "10k for Geno," which Inmate One understood to mean that Long wanted Geno killed. J.A. 331.  Inmate One, in turn, passed this message along to Rico Thomas. J.A. 332.

10

Inmate One received money from Long and gave it to Thomas, who split it with Mr.

Moore. J.A. 335-38. On another occasion, Inmate One gave Thomas information

about another person Long wanted killed. J.A. 338. Again, Thomas called Inmate

One and told him the job was done, J.A. 342, and Long gave Inmate One seven

thousand dollars. Tr. 116. Inmate One and Thomas later met with Mr. Moore. J.A.

345. Several months later, but still in 2007, Long requested another man be killed.

J.A. 347. Long provided Inmate One with an address and vehicle description, and

Inmate One met with Thomas and Mr. Moore. J.A. 348. Once again, Thomas called

to say that it had been done, he and Inmate One went to meet Long, they got the

money and left to meet Mr. Moore, although Inmate One never saw this money paid

to Mr. Moore. J.A. 351,354. Inmate One pleaded guilty to these crimes in federal

court in the District of Columbia in exchange for a recommendation that his sentence

be served concurrently with the his Virginia sentence. J.A. 360.[4]

Inmate Two also entered into a plea agreement, for which he was promised a

four level reduction in his offense level in exchange for cooperation against Mr.

Moore. J.A. 419. Without such an agreement, Inmate Two would have received life

imprisonment. J.A. 420. Inmate Two met Mr. Moore while they were both housed

---

[4] The District of Columbia prosecutors were present at proffer sessions involving Inmate One, and were also present at Mr. Moore's sentencing hearing in Maryland.

in the Charles County Detention Center, and during their stay Mr. Moore purportedly told him about burglary and armed robbery. J.A. 418, 420-21. During a conversation, Mr. Moore supposedly described a home that sounded to Inmate Two like the home of his son's mother's uncle. J.A. 424.

After both Inmate One and Inmate Two accused Mr. Moore of uncharged crimes, Sergeant Blazer took the stand to purportedly corroborate the previous testimony. He found that "Geno," also known as Franklin Moyler, had been murdered in January 2007, and that Thomas had contact with both Geno and Mr. Moore by phone during that time period. J.A. 468-69. Regarding the second incident described by Inmate One, Sgt. Blazer found that Melvin Terrell had been shot in January 2007, at the general location that Inmate One described. J.A. 473. Sgt. Blazer added that the victim's girlfriend said she thought that Terrell had pulled at a mask, *id.*, but that neither he or any other investigator ever showed Mr. Terrell's girlfriend any photographs. J.A. 521. Inmate One had also described a second incident where the a gun jammed and Thomas and Mr. Moore had worn suits. J.A. 477. Sgt. Blazer found that a man named Michael Majors had been shot in June of 2007, but was uncooperative when he was interviewed. J.A. 480. When Majors was interviewed again, he said the suspects wore suits, and that the gun jammed, but did not identify any one. *Id.* Sgt. Blazer read the incident reports regarding the three

12

incidents, but did not participated in the investigations. J.A. 514, 528. Finally, Sgt. Blazer was in possession of Mr. Moore's Bureau of Prisons (hereafter "BOP") file, the entirety of which was admitted into evidence at sentencing. J.A. 498, 508.[5]

The district court began by noting that it was not bound by the guidelines, and that any variance must be tied to the factors set forth in 18 U.S.C. § 3553(a), accompanied by findings of fact if necessary. J.A. 560-61. The standard for findings of fact was found to be preponderance of the evidence. J.A. 562. With regard to the murder of Jason Schwindler, the court found that Mr. Moore was involved based on the DNA, the shopping receipt and the fact that Mr. Moore generally resembled the second robber. J.A. 563. The court found generally that the testimony of Inmate One was credible, reliable, and corroborated by Sgt. Blazer. J.A. 565. Similarly, the court found that, in general, the testimony of Inmate Two was reliable, credible, and corroborated since Mr. Moore's car had, in the past, been found with burglar tools in

_____

[5] In addition to everything else that Mr. Moore had allegedly done, a man named Carlos Webb was murdered in an area where, at some point in time, Mr. Moore had been seen. J.A. 486. The last phone call from Webb's phone was to Mr. Moore's phone, but there were no witnesses to the murder. J.A. 523. The victim's wife, mistress and friend were interviewed, but their names were never disclosed to Mr. Moore. J.A. 487-91. The wife said that the victim said if anything happened to him, "O." J.A. 487. The mistress recanted what she initially told investigators and denied knowing who "O" was. J.A. 490. The friend knew nothing of the murder, only that Mr. Moore and the victim knew each other. J.A. 492.

it. J.A. 566.  Having summarily made those determinations, the district court found,

by a preponderance of the evidence that Mr. Moore was involved in murder,

attempted murder and burglary. *Id.*  The court continued, and found the BOP records

indicated Mr. Moore was dangerous. Tr. 340.  Regarding the § 3553(a) factors, the

court found the following: Congress provided a life sentence as an option for

possession of ammunition by a felon; no sentence would promote Mr. Moore's

respect for the law-he had no respect for the law; Mr. Moore would not be deterred

without a significant sentence; there was no way to protect the public without a

significant sentence; Mr. Moore could only receive treatment and training in prison;

and regarding disparity, Mr. Moore's case was the worst the court had seen. J.A. 568-

70.  The court found that a sentence within the guidelines would not be adequate, and

sentenced Mr. Moore to life imprisonment for count one; and sixty months,

concurrent, for count two. J.A. 572.

## SUMMARY OF ARGUMENT

Mr. Moore was convicted of being a felon in possession of ammunition based

on evidence found in his car pursuant to a stop and search of his vehicle.  Officers

initiated a traffic stop of Mr. Moore's vehicle without probable cause and therefore

violated his Fourth Amendment rights.   Evidence found pursuant to that search

should have been suppressed.

14

Mr. Moore was subjected to a sentencing hearing that violated rights guaranteed to him by the Fifth and Sixth Amendments. The district court permitted the government to present evidence of serious crimes including murder and attempted murder, wholly unrelated to the crime for which Mr. Moore was convicted, and relied upon those facts in sentencing Mr. Moore to life imprisonment. Relying on that information violated Mr. Moore's Sixth Amendment rights to a jury trial. The district court violated Mr. Moore's Fifth Amendment due process rights by finding facts of the unrelated crimes, not beyond a reasonable doubt, but only by a preponderance of the evidence.

The district court further violated Mr. Moore's Fifth Amendment due process rights by denying him the opportunity prior to sentencing to review materials produced by virtue of subpoena. Mr. Moore's Sixth Amendment right to confrontation was violated when the district court permitted and considered testimonial hearsay in imposing its sentence upon Mr. Moore. The district court also violated Mr. Moore's Fifth Amendment rights by considering unreliable hearsay testimony and by admitting evidence containing unreliable hearsay.

Further, the sentence imposed upon Mr. Moore was procedurally unreasonable as the district court failed to adequately connect its sentence to the sentencing factors set out in U.S.S.G. § 3553(a). Mr. Moore's sentence was substantively unreasonable

15

as the evidence that the district court relied upon did not meet the preponderance of the evidence standard.

In addition to the above violations, the district court found Mr. Moore to be an armed career criminal, and pursuant to that finding found that Mr. Moore was subject to a maximum sentence of life imprisonment. In so finding, the district court violated Mr. Moore's Sixth Amendment right to have all factors that could increase his sentence found by a jury beyond a reasonable doubt.

## ARGUMENT

I.    THE LOWER COURT ERRED IN ADMITTING EVIDENCE FOUND PURSUANT TO A TRAFFIC STOP AND ARREST OF APPELLANT THAT WAS NOT SUPPORTED BY PROBABLE CAUSE IN VIOLATION OF THE FOURTH AMENDMENT

This Court reviews a district court's factual findings regarding a motion to suppress evidence for clear error, and a district court's legal conclusions *de novo*. *United States v. Brown*, 401 F.3d 588, 592-593 (4th Cir. 2005) (citing *United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000)).

As this Court has recognized, "[t]he Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *Brown*, 401 F.3d at 592 (quoting U.S. Const. amend. IV). The standard that must be met before a warrantless

16

encounter by the police is deemed reasonable depends on the type of encounter-arrest, investigatory stop, or brief encounter. *Brown*, 401 F.3d at 592. An arrest must be supported by probable cause, while an investigatory stop must be supported by reasonable articulable suspicion, and an encounter need not be supported at all. *Brown*, 401 F.3d at 592-593 (citing *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002)). This Court has recognized that "probable cause is not susceptible to precise definition," but that it "'exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" *United States v. Brookins*, 345 F.3d 231, 235 (4th Cir. 2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1983)). This Court has also recognized that, "the quantum of suspicion necessary for a Terry stop is less demanding than that for probable cause, [but] an officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *Brown*, 401 F.3d at 596 (internal citations omitted).

In the context of a warrantless search of an automobile, this Court has held that "[o]fficers may search a readily mobile automobile if they have probable cause to believe that their search will uncover contraband." *United States v. Johnson*, 599 F.3d 339, 347 (4th Cir. 2010) (citing *United States v. Kelly*, 592 F.3d 586, 589-91 (4th Cir. 2010)). With regard to evidence found as the result of a search, this Court has held

that, "[e]vidence gathered as fruit of an unreasonable search or seizure is generally

inadmissible against a defendant." *Brown*, 401 F.3d at 592 (citing *Taylor v. Alabama*,

457 U.S. 687, 694 (1982) and *Wong Sun v. United States*, 371 U.S. 471, 484-86

(1963)). Thus, items found pursuant to an unreasonable, and thus unlawful search,

should be suppressed.

In this case, a pretrial hearing on Mr. Moore's Motion to Suppress, was held

on November 26, 2008. Mr. Moore moved that the evidence found in his car be

suppressed as law enforcement lacked probable cause to stop and search his vehicle.

After the hearing the district court found that officers had observed the exchange of

a bag, the contents of which were consistent with ammunition, and that officers

followed the vehicle into the District of Columbia where it was illegal for Mr. Moore

to possess ammunition. Having thus found, the court held there was adequate

probable cause to support the stop of the vehicle, and denied Mr. Moore's Motion to

Suppress.

The district court erred in determining that the officers had probable cause to

stop Mr. Moore, and search his vehicle. The testimony of Agent McLoughlin, the

sole witness at the hearing, revealed that upon initiation of the traffic stop, Mr. Moore

was told to toss his keys from his vehicle, and was handcuffed immediately thereafter.

J.A. 57. In *Brown*, this Court found that Brown had been seized when he submitted

18

to the officer's order to place his hands on the car in front of him. *Brown*, 401 F.3d at 595. Since Mr. Moore was immediately handcuffed upon the initiation of the stop of his vehicle, he was arguably arrested at that moment, but was at least seized. *See id.* at 593 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Mr. Moore's vehicle was searched with no more information known to law enforcemnet than at the time of the stop, and thus, the search needed to be independently supported by probable cause. *Johnson*, 599 F.3d at 347. As noted, the district court found that the officers had probable cause to stop the vehicle based upon McLoughlin's testimony that officers witnessed the exchange of a bag, and that the vehicle Mr. Moore was driving was followed into the District of Columbia. J.A. 65.

The court first erred in characterizing the bag that the officer's saw exchanged. The court stated that the contents of the bag were consistent with ammunition. *Id.* However, McLoughlin testified only that the bag had a heavy square object in it, but that the store it was purchased from sold other items with that same weight and shape. J.A. 43-44. McLoughlin further testified that none of the officers confirmed with the store that the item purchased was ammunition. J.A. 53. And although McLoughlin testified that another officer observed the transfer of the bag, he could not testify that it was the same bag. Prior to the search of Mr. Moore's vehicle, at the time of the stop, the officers had only a hunch that the bag contained ammunition. And, at the

19

time that Mr. Moore was stopped, officers did not know if he was permitted to carry ammunition in the District of Columbia since they did not know his identity at the time of the stop.

Since a hunch does not support a finding of reasonable suspicion, a hunch certainly does not support a finding of probable cause. *See Brown*, 401 F.3d at 596. In *United States v. Gooding*, 695 F.2d 78, 83 (4th Cir. 1982), this Court found that a suspect fitting the criteria of a drug courier profile, without more, does not rise to reasonable suspicion to conduct an investigatory stop. Here, officers were suspicious of Mr. Moore essentially because he fit a profile of people they thought were likely to purchase firearms illegally. That suspicion, however, did not rise to the probable cause needed to justify the stop of Mr. Moore's vehicle and the ensuing search. In *United States v. Ibarra-Sanchez*, 199 F.3d 753, 758-60 (5th Cir. 1999), the Fifth Circuit found that despite "a veritable cornucopia of factors suggesting drug-related activity" officers did not have probable cause for a warrantless search until they smelled marijuana when approaching the vehicle. Prior to the stop of Mr. Moore's vehicle, law enforcement had less than a cornucopia of factors to lead them to believe he was committing a crime. And unlike the circumstances in *Ibarra-Sanchez*, law enforcement gained no new information upon approach of Mr. Moore's vehicle, they simply handcuffed him and searched the vehicle.

20

Law enforcement did not have probable cause to stop Mr. Moore, nor did they have probable cause to search his vehicle. Therefore, the warrantless search of the vehicle was unreasonable. Since the ammunition in the vehicle was found pursuant to that unreasonable warrantless search, it should have been suppressed. *Wong Sun*, 371 U.S. at 485. The district court erred in finding that the officers had probable cause to stop Mr. Moore, and search his vehicle, and in denying Mr. Moore's Motion to Suppress that evidence.

II.  APPELLANT'S SIXTH AMENDMENT RIGHTS WERE VIOLATED BY SENTENCING HIM TO LIFE IMPRISONMENT BASED SOLELY ON FACTS NOT FOUND BY A JURY

Constitutional questions are reviewed by this Court *de novo*. *United States v. Myers*, 280 F.3d 407, 416 (4th Cir. 2002); *United States v. Pitts*, 176 F.3d 239, 244 (4th Cir. 1999).

There are rights afforded to criminal defendants that distinguish American jurisprudence from its ancestors, and other systems of justice, some of which are those enumerated in the Sixth Amendment. However, Courts of Appeal and the United States Supreme Court have long endeavored to reconcile a defendant's Sixth Amendment rights with various sentencing schemes. In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court explained, "[a]t stake in this case are constitutional protections of surpassing importance: the proscription of any

21

deprivation of liberty without due process of law, and the guarantee that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury." *Id.* at 476-477 (internal citations omitted). A defendant's sentence relates to these all important rights in that "[t]he defendant's ability to predict with certainty the judgment from the face of the felony indictment flow[s] from the invariable linkage between punishment and crime." *Id*. (internal citations omitted). In *Apprendi*, the Court held that a sentencing scheme, where a sentence increase depends solely on judicial fact-finding, is unconstitutional. *Id.* at 497. The Court recognized that "[s]ince *Winship*, we have made clear beyond peradventure that *Winship's* due process and associated jury protections extend, to some degree, to determinations that [go] not to the defendant's guilt or innocence, but simply to the length of his sentence." *Apprendi*, 530 U.S. at 484 (internal quotation omitted).

Since *Apprendi*, the Court has had cause to revisit this issue. In *Blakely v. Washington*, 542 U.S. 296 (2004), the Court held that the defendant's increased sentence based on a judicial finding that the crime was committed with deliberate cruelty was unconstitutional. *Id.* at 313. In so holding, the Court noted, "[t]he Framers would not have thought it too much to demand that, before depriving a man of three years of his liberty, the State should suffer the modest inconvenience of submitting its accusation to the unanimous suffrage of twelve of his equals and

22

neighbors." *Id.* (internal quotation omitted). Particularly germane to the instant case, the Court explained the alternative: "that a judge could sentence a man for committing murder even if the jury convicted him only of illegally possessing the firearm used to commit it . . . ." *Id.* at 306. In finding this to be an "absurd result" the Court continued, "[t]he jury could not function as circuitbreaker in the State's machinery of justice if it were relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the fact the State *actually* seeks to punish." *Id.* at 306-307 (emphasis in original).

Not long after *Blakely*, sentencing in federal court was substantially altered in *United States v. Booker*, 543 U.S. 220 (2005). In holding the United States Sentencing Guidelines to be advisory only, the Court recognized the "principles [they] sought to vindicate" in *Apprendi*, and reiterated that "[t]he Framers of the Constitution understood the threat of judicial despotism that could arise from arbitrary punishments upon arbitrary convictions without the benefit of a jury in criminal cases." *Id.* at 238-239 (internal citations omitted). With reference to information about a defendant presented at sentencing, the Court went on to clarify that, "the defendant is punished only for the fact that the present offense was carried out in a manner that warrants increased punishment . . . ." *Id.* at 240 (internal citations omitted). As to its holding, in general, the Court noted that what Congress intended

23

was "increased uniformity of sentencing," and that advisory guidelines would still maintain a "strong connection between the sentence imposed and the offender's real conduct." *Id.* at 246.[6]

In *Cunningham v. California*, 549 U.S. 270 (2007), the Court had occasion to clarify *Booker* as it examined California's determinate sentencing system. Cunningham had been convicted of continuous sexual abuse of a child, for which he was to receive a sentence of 12 years, unless the sentencing judge found an additional aggravating factor. *Id.* at 275. The Supreme Court held that the California system was unconstitutional since it was at odds with the holding of *Apprendi*. *Id.* at 293. The Court reiterated its caution espoused in *Blakely*, that a sentencing court's broad discretion "does not shield a sentencing system from the force of our decisions." *Id.* at 290. Further, the Court explained that "[t]he reasonableness requirement Booker anticipated for the federal system operates within the Sixth Amendment constraints delineated in our precedent, not as a substitute for those constraints . . . . Booker's remedy for the Federal Guidelines, in short, is not a recipe for rendering our Sixth Amendment case law toothless." *Id.* at 292-293.

---

[6] The Court found that "Congress' basic statutory goal-a system that diminishes sentencing disparity-depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that **underlies the crime of conviction**." *Booker*, 543 U.S. at 250 (emphasis added).

24

Mr. Moore's sentence violates the Sixth Amendment, and due to that violation, he was sentenced to serve the remainder of his natural life in prison for being a felon in possession of ammunition. His sentence would never have been imposed without the judicial fact finding that took place at his sentencing hearing. The district court supported a variant sentence using facts that were never put before the jury, since they were wholly unrelated to the conviction. For this reason, analysis of the legality of Mr. Moore's sentence under the framework of the Sixth Amendment is as important as, and indeed overlaps with, the analysis under the substantive reasonableness test.

Mr. Moore's sentencing hearing can only be described as a star chamber-like grouping of mini-trials. The court admitted as evidence at sentencing the entire transcript and exhibit book from a completely unrelated trial, *United States v. Davis,* where counsel for Mr. Moore was not present and had no opportunity to cross examine witnesses. J.A. 284. Additionally, the court permitted Inmate One to testify and accuse Mr. Moore of an additional murder and of two attempted murders. J.A. 329-351, and Inmate Two to accuse Mr. Moore of burglaries, in general, J.A. 422. Finally, the court permitted Sgt. Blazer to: accuse Mr. Moore of another unsolved murder, J.A. 486; state that "burglary tools" were found in Mr. Moore's car, J.A. 484; and reference incidents recorded in Mr. Moore's BOP file, J.A. 498. None of these allegations had anything to do with the crime for which Mr. Moore was convicted-

possession of ammunition, and should not have been permitted or considered at his sentencing. At the time of his sentencing, Mr. Moore had not been charged with any of these crimes, much less been in front of a jury.[7] It was harmful enough that these allegations were presented at sentencing, but the court based its imposition of a life sentence on the allegations. Summarily, the court found that Mr. Moore was involved in the murder of Jason Schwindler, J.A. 563; that he was involved in the murder and attempted murders alleged by Inmate One, J.A. 565; and that he was involved in non-specific burglaries alleged by Inmate Two, J.A. 560.

Recently, in *United States v. Raby*, 2009 WL 5173964 (S.D.W.Va.), the defendant pleaded guilty to receiving child pornography, and the government recommended a severe sentence based on relevant conduct, some of which it admitted was mere conjecture. *Id.* at *1, *7. The district court noted that even though the defendant admitted to the relevant conduct, it was not the offense of conviction. *Id.* at *8. The district court explained that "relevant conduct must be considered appropriately." *Id.* In sentencing Raby to a below guidelines sentence, the court cautioned, "[i]f the government wants [defendant] to be principally punished for

---

[7] Since his sentencing hearing in Maryland, and consistent with constitutional norms, Mr. Moore has been indicted in the United States District Court for the District of Columbia (case no. 10-171 (JDB) for the murder of Franklin Moyler, the attempted murder of Melvin Terrell, and the attempted murder of Michael Majors.

committing other criminal acts, then it should charge him with those acts. But the United States is not entitled to indict an individual on one charge, and then after conviction seek to punish him for other crimes." *Id.*

Mr. Moore's sentence is the "absurd result" the Supreme Court predicted in *Blakely*. Mr. Moore was convicted of possessing ammunition, but sentenced for murders, attempted murders and burglaries.[8] The court tasked to sentence Mr. Moore for his crime should not have been presented with information regarding these allegations, and certainly should not have based its imposition of a life sentence on it. The Court in *Booker* reminded us of the "threat of judicial despotism" that can arise with arbitrary punishment. *Booker*, 543 U.S. at 238-239 (internal citation omitted). That threat became reality when the district court punished Mr. Moore, under the guise of an unrelated conviction, for murders and attempted murders. Mr. Moore had not been charged with the crimes presented at sentencing, much less had them tested by a jury. The sentence imposed by the court, which was based on untested allegations of the government, violated the Sixth Amendment.

---

[8] The prediction in *Blakely* at least assumed that the possessed firearm was used to commit the murder, although the jury acquitted of the murder. In Mr. Moore's case, the ammunition he possessed was not involved in the allegations for which he was sentenced. The allegations stand as mere accusations-devoid of investigation.

III.   APPELLANT'S FIFTH AMENDMENT RIGHTS WERE VIOLATED BY
INCREASING HIS SENTENCE FROM THE GUIDELINES RANGE TO
LIFE IMPRISONMENT BASED SOLELY ON FACTS NOT FOUND
BEYOND A REASONABLE DOUBT

Constitutional questions are reviewed by this Court *de novo*. *Myers*, 280 F.3d

at 416; *Pitts*, 176 F.3d at 244.

In addition to violating Mr. Moore's Sixth Amendment rights, a sentence based

on factual findings of the court violated his Fifth Amendment rights. "A person when

first charged with a crime is entitled to a presumption of innocence, and may insist

that his guilt be established beyond a reasonable doubt." *Herrera v. Collins*, 506 U.S.

390, 398 (1993). It follows that if a person is entitled to the presumption of

innocence after he has been charged, then the inference of innocence should be

greater when a person has never been charged. In general, a case against a person

begins either with probable cause to arrest, or with the considered judgment of a

quorum of citizens (*i.e.* a grand jury) having decided that the government has enough

evidence to pursue official charges. However, these steps were omitted with regard

to the serious allegations presented at Mr. Moore's sentencing. Having omitted these

all-important steps, and the rights that accompany them, the Fifth Amendment

required that the government, at a minimum, be held to a higher standard of proof

than preponderance of the evidence.

28

The Supreme Court has explained the importance of the reasonable doubt standard in American jurisprudence as follows:

> The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence-that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law.

*In re Winship*, 397 U.S. at 363 (quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895)).  Further, the reasonable-doubt standard is "indispensable to command the respect and confidence of the community in applications of the criminal law." *In re Winship,* 397 U.S. at 363.

Questions about the applicability of due process at sentencing arose prior to *Booker* under the mandatory federal sentencing scheme.   In *United States v. Kikumura*, 918 F.3d 1084 (3rd Cir. 1990), the Third Circuit held that Kikumura was entitled to greater procedural protections involving the standard of proof and admissible evidence at sentencing before a substantial upward departure from the guidelines could be imposed. *Id.* at 1102.  The Third Circuit noted that the departure was "perhaps the most dramatic example imaginable of a sentencing hearing that functions as a 'tail that wags the dog of the substantive offense.'" *Id.* at 1100-1101 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 91 (1986)).

29

In *United States v. Fisher*, 502 F.3d 293 (3rd Cir. 2007), the Third Circuit held that *Kikumura* did not survive *Booker*, and that no greater process than usual was due a defendant during a sentencing proceeding. *Id.* at 305. Citing the Sixth Circuit, the court found that post-*Booker* "challenges to 'large enhancements . . . should be viewed through the lens of Booker reasonableness rather than that of due process.'" *Fisher*, 502 F.3d at 306 (quoting *United States v. Brika*, 487 F.3d 450, 460-462 (6th Cir. 2007)). However, the court recognized the following, "we do not suggest that sentencing never implicates due process-as the foregoing history of due process at sentencing makes clear, it does." *Fisher*, 502 F.3d at 306. The court specifically found that there are "impermissible considerations" that should not be relied upon by a court, and that due process had not been removed from the sentencing equation. *Id.* at 306.

This Court had occasion to analyze this issue in *United States v. Grubbs*, 585 F.3d 793 (4th Cir. 2009). In *Grubbs*, the district court determined that evidence produced at sentencing, through victims and primary investigators, was reliable and that the uncharged conduct was almost identical to the crimes for which defendant was convicted. *Id.* at 797. Relying heavily on the reasoning in *Fisher*, this Court held that the district court had not erred in relying on conduct of the defendant, similar to that for which he was to be sentenced, to increase defendant's sentence. *Id.* at 803-

30

804. This Court reviewed the Fifth Amendment challenge in *Grubbs* for plain error as it had not been preserved in the lower court, and did not address the considerations that *Fisher* noted would still be subject to due process analysis. *Id.* at 799.

This is the case where addressing the relationship between due process and *Booker* reasonableness is unavoidable, and where the due process challenge was preserved for review. The Fifth Amendment can be violated by merely considering impermissible information, and by failing to subject the government to a heightened standard of proof.

It is important to note that in *Grubbs*, the increase in Grubbs' sentence was well below the statutory maximum, whereas Mr. Moore was sentenced to the statutory maximum-life imprisonment. Also, unlike the instant case, the similar conduct in *Grubbs* relied on at sentencing was brought before the court through testimony of Grubb's victims and the investigator of the case. Equally important, the conduct was identical to that Grubbs was convicted of and the allegations presented at sentencing were set out in the Presentence Report (PSR). *Id.* In stark contrast, Mr. Moore's PSR said nothing of the conduct that was presented at sentencing, and the information relied upon by the court was wholly unrelated to the crime for which Mr. Moore was sentenced-being a felon in possession of ammunition. J.A. 601. Despite that, the court made factual findings that he had been involved in an unsolved murder,

31

and two unsolved attempted murders, that occurred years prior.  Considering that no court, jury, or presumably grand jury, was presented with these allegations, due process demanded that the court subject the allegations to a heightened standard of proof, if not refuse to consider them at all.

The information presented at sentencing to implicate Mr. Moore in the unrelated crimes the government alleged he committed was anemic.  So much so that with regard to the Schwindler murder, the district court itself recognized that, "the government does not have sufficient evidence to convict defendant of that crime, or they would have done so." J.A. 562.   Despite that recognition, the court was conviced that Mr. Moore was involved in the murder of Jason Schwindler based on a DNA sample found at the scene, a shopping receipt, Mr. Moore's casual statement that he hoped Davis was not cooperating, a newspaper clip regarding the murder that Mr. Moore sent to a friend, and the fact that Mr. Moore generally resembled the second robber. J.A. 563-65.  The DNA sample was compared to Mr. Moore's DNA, and the government admitted that he could not be excluded or included as a contributor of the DNA. J.A. 286.  Further, prior to trial in the Davis case, the same court found that without statistics to help explain that conclusion, that conclusion was not relevant, nor was it admissible. *Davis*, 602 F.Supp.2d at 679.  Also, in Mr. Davis' trial, witnesses that testified about the shopping receipt were not able to identify the

32

person with Mr. Davis, other than to state that he was black. No items detailed on the receipt were ever linked to Mr. Moore, despite a search warrant executed during the investigation of the Schwindler murder. There was no indication as to what Mr. Moore was referring when Inmate One supposedly heard him say he hoped Davis was not cooperating. Finally, Sgt. Blazer investigated the murder, and admitted that the still surveillance photograph depicted only the back of a person's head. J.A. 519, 748.

As for the other crimes Mr. Moore was accused of, the court simply found that the inmate witnesses were reliable and credible, and that Sgt. Blazer corroborated their testimony. The court never mentioned Inmate One's motives to fabricate testimony based upon his plea agreements, nor his willingness to lie while testifying. Similarly, the court never noted Inmate One's heroin addiction, schizophrenia, or bipolar disorder, all of which had gone untreated. J.A. 361, 408-09. The court found corroboration in Sgt. Blazer although he only confirmed that the crimes existed and were unsolved. There was no evidence presented that linked Mr. Moore to those crimes other than the lone testimony of Inmate One. It is just as likely that Inmate One, or some other acquaintance committed the crimes as it is that Mr. Moore committed them.[9]

---

[9] At sentencing, Inmate One could not testify as to when these incidents took place, only that the conversations he had with Thomas took place during the day, sometime in 2007. J.A. 376.

Inmate Two freely admitted that without cooperating with authorities he would have received a life sentence, and that he was promised a four-level reduction of his base offense level. J.A. 419. Inmate Two gave no specifics as to burglaries that he accused Mr. Moore of committing, J.A. 422, and no one endeavored to investigate his allegations, yet the court found the testimony credible, reliable and corroborated. Given the severity of the crimes Mr. Moore was accused of at sentencing, and the fallibility of the witnesses against him, due process demanded that a heightened standard of proof be used by the court in making its factual findings.

Finally, Mr. Moore's Fifth Amendment rights to due process were violated, much in the same way his Sixth Amendment rights were violated. The court supported the imposition of a life sentence based on allegations by the government that should never have been presented at Mr. Moore's sentencing. The multiple mini-trials conducted over the course of Mr. Moore's sentencing hearing were replete with hearsay, and purportedly linked him to crimes completely unrelated, in substance and in time of occurrence, to his conviction. Factually, this case differs wildly from *Grubbs* and other similar cases. The conduct on which the district court based the substantial increase of Mr. Moore's sentence is just the kind of impermissible consideration alluded to by the court in *Fisher*.

34

If there is any case that demonstrates that due process must remain viable at sentencing, aside from *Booker* reasonableness, it is this one. Mr. Moore was tried and convicted of one crime, only to have the United States Government present accusations of numerous other uncharged crimes to the court in support of its request for a life sentence. This is not the due process that the Framers of the Constitution envisioned. Rather, this is precisely the judicial despotism and governmental power that they sought to prevent. Mr. Moore had the right to be sentenced for his conviction without fear that unfounded accusations by the government could permanently revoke his liberty. Due process demands that consideration of this type of information not take place, or at least that a higher standard of proof be employed by a district court considering conduct unrelated to the conviction. Without that, those convicted of crimes will be subject to a star chamber-like process characterized by the absence of any meaningful opportunity to defend their liberty.

IV.  APPELLANT'S SENTENCE WAS PROCEDURALLY AND SUBSTANTIVELY UNREASONABLE

> A.  Appellant's Sentence was Procedurally Unreasonable As the Lower Court Failed to Connect Appellant's Variant Sentence to the Factors Set out in 18 U.S.C. § 3553(a).

This court reviews the reasonableness of a sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Pauley*, 511 F.3d 468,

473-474 (4th Cir. 2007). In *Gall*, the Supreme Court explained that in determining the procedural reasonableness of a sentence, a reviewing court must determining the following: (1) whether the lower court properly calculated the guideline range; (2) whether the court considered the factors set out in 18 § U.S.C. 3553(a); (3) whether the court analyzed and considered the arguments of the parties; and (4) whether the court sufficiently explained the sentence it imposed. *Gall*, 552 U.S. at 49-50 (citing *Rita v. United States*, 551 U.S. 351 (2007)).

Initially, the district court erred in calculating Mr. Moore's guidelines since it, and not a jury, determined that he was an armed career criminal, pursuant to 18 U.S.C. § 924 (e). J.A. 268. But for that finding, Mr. Moore's guidelines would have been 63-78 months, not 188-235 months, and Mr. Moore would not have been subject to a statutory maximum sentence of life imprisonment. Mr. Moore's sentence is procedurally unreasonable for this reason alone. *See infra* section VI. However, the court also failed to consider the 3553(a) factors, failed to analyze the arguments of the parties, and failed to sufficiently explain the sentence it imposed.

While the court noted the existence of the 18 § U.S.C. 3553(a) factors, it did not meaningfully consider them as required. In this respect the court made the following general observations:

1. The nature and circumstances of the offense were quite serious. J.A. 568.

36

2. "Mr. Moore has no respect for the law, that virtually no sentence is going to be enough . . . ." *Id.*

3. "A person who is engaged in the nature of crimes that this defendant has committed in the past, and has been committing right up until his arrest in this case is troubling, and the persons who like to live like that are never going to stop doing that unless deterred by seeing significant jail sentences imposed." J.A. 569.

4. "I see no way to protect the public from further crimes of this defendant without imposing a very significant jail sentence." *Id.*

5. Any training or care needed by Mr. Moore would only be effective in jail. J.A. 570.

6. In noting that it needed to avoid sentencing disparities, the court described this case as, "the worst [it had] seen." *Id.*

7. There can be no restitution in a case like this. *Id.*

After making these observations, the court stated that "a sentence within the guidelines would be woefully inadequate," considering that the defendant has been proven, by a preponderance of the evidence, to be dangerous. J.A. 571. While the court purportedly considered the 3553(a) factors, what it really did was list them, and summarily concluded that a guideline sentence would not suffice. Only once did the court even mention the crime of conviction-being a felon in possession of ammunition, but supported its conclusions with every instance of unrelated conduct of which the government accused Mr. Moore.

37

In addition to a district court's consideration of the 3553(a) factors, this Court also reviews the district court's analysis of arguments presented by the parties. The district court overruled every constitutional objection Mr. Moore posed at sentencing. It denied Mr. Moore the ability to investigate the government witnesses; permitted the government to proffer its theories as to conduct Mr. Moore was involved in; and accepted the government's evidence despite it sparseness and unreliability. As to the witnesses that the government did call, the court simply accepted their testimony without analysis. *See* section III. *supra*.

The court also failed to sufficiently explain the sentence it imposed. As noted, the court simply accepted the testimony, *in globo*, of the inmate witnesses. The court failed to make specific findings of fact that Mr. Moore was involved in the specific murders and attempted murders, of which the government accused him. Summarily accepting the government's evidence without making findings of fact is akin to a jury verdict that reads simply, "guilty," when the defendant was tried on ten different counts. Hearing nine hours of evidence, and merely concluding that Mr. Moore was involved in murders, attempted murders and burglaries, is procedurally unreasonable.

Similarly, while the court found that Mr. Moore was responsible for the Schwindler murder, the evidence it used to support that finding did not meet the preponderance of the evidence standard. In analyzing the 3553(a) factors the court

never mentioned the Schwindler murder, just as it failed to mention specific crimes alleged by the inmate witnesses. As for the BOP records, the court mentioned two specific incidents, yet only by month and year for one, and year for the other. J.A. 567. The court then described "repeated[]" involvement in incidents from 1997-2001. *Id.* The court failed to refer to the BOP incidents with specificity, much less find that Mr. Moore was responsible for these incidents, or that the information supplied by the government was reliable or corroborated.

Finally, the court failed to link its summary conclusions to its determination that a guideline sentence was insufficient. The court stated only that, "there's very significant indication that this is a dangerous man." J.A. 567. The court stated, with regard to the 3553(a) factors that only a significant jail sentence would suffice, but never explained why a 235 month sentence, the high-end of the guidelines, was not a significant jail sentence. Further, the court never explained why a life sentence advanced the interests of the 3553(a) factors, but a 235-month sentence would not. Mr. Moore's sentence is impermissible for all the reasons set forth above and below, including that it is procedurally unreasonable.

B.   Appellant's Sentence was Substantively Unreasonable As the District Court Based it On Conduct Unrelated to Conviction That Did Not Meet the Preponderance of the Evidence Standard

As noted, this Court reviews the reasonableness of a sentence for abuse of

39

discretion. *Gall,* 552 U.S. at 51; *Pauley*, 511 F.3d at 473-474.  In *Booker*, the Supreme Court held that a sentence should be reviewed at the appellate level for reasonableness. *Booker*, 543 U.S. at 261.  In *Rita*, the Supreme Court held that an appellate court's presumption that a guidelines sentence is reasonable does not violate the Sixth Amendment. *Rita*, 551 U.S. at 347.  Justice Scalia filed a separate opinion in *Rita* wherein he explained why the reasonableness review, in a case such as  Mr. Moore's,  will overlap with an analysis of Fifth and Sixth Amendment concerns. *Id.* at 368 (Scalia, J., concurring).  In that opinion,  Justice Scalia noted that post-*Rita*, "some sentences reversed as excessive will be legally authorized in later cases only because additional judge-found facts are present," and that "[t]he Court has reintroduced the constitutional defect that Booker purported to eliminate." *Id.* at 369-370.  In conclusion, Justice Scalia cautioned: "there will inevitably be some constitutional violations under a system of substantive reasonableness review, because there will be some sentences that will be upheld as reasonable only because of the existence of judge-found facts.  *Booker* itself reveals why that reality dooms the construct of reasonableness review . . . ." *Id.* at 374. In *Gall*, Justice Scalia reiterated that "the door therefore remains open for a defendant to demonstrate that his sentence . . . would not have been upheld but for the existence of a fact found by the sentencing judge and not by the jury." *Gall*, 552 U.S. at 602-603 (Scalia, J.,

40

concurring).

As Justice Scalia noted was possible, Mr. Moore's life sentence is substantively unreasonable for the same reasons that it is unconstitutional-because it was based on facts found by only the court. In examining the substantive reasonableness of Mr. Moore's sentence, the question is whether a life sentence is reasonable given his guideline range of 188-235 months, and given what the court relied upon to support its sentence. Mr. Moore's sentence was based on factual findings of unrelated conduct that did not meet the preponderance of the evidence standard, and is therefore procedurally unreasonable.

Even if the district court was not required to use a higher standard of proof than preponderance, before accepting the government's allegations that Mr. Moore was involved in two murders, two attempted murders and burglaries, it had to be convinced that he more likely than not was involved. Based on what the government presented at sentencing, the court could not reasonably find that it is more likely than not that Mr. Moore committed the crimes the government accused him of. Therefore, the life sentence the court imposed based on its findings of facts is substantively unreasonable.

As previously noted, the only specific findings of fact that the court made were with regard to the murder of Jason Schwindler. The court stated that it was satisfied

41

that Mr. Moore was involved in the murder of Jason Schwindler based on a DNA sample found at the scene, a shopping receipt dated shortly after the murder, a statement supposedly heard by Inmate One that Mr. Moore hoped Davis was not cooperating, a newspaper clip regarding the murder that Mr. Moore sent to a friend, and the fact that Mr. Moore generally resembled the second robber. J.A. 563-65. Again, Mr. Moore could not be excluded or included as a contributor of the DNA found at the scene. J.A. 286. Further, prior to trial in the Davis case, the same court found that without statistics to help explain that, mention of that information was not relevant. *Davis*, 602 F.Supp.2d at 679.[10]   At Mr. Moore's sentencing, however, the same court found him responsible supported by that very DNA evidence.   The shopping receipt found in Mr. Moore's wife's car is not evidence that Mr. Moore was on the shopping trip, much less that he was involved in a murder.   There was no testimony or evidence regarding the context of Mr. Moore's supposed statement about Mr. Davis, or any evidence clarifying the circumstances or context of the newspaper clipping.   Finally, it is absurd to support a finding that Mr. Moore was involved with his general physical characteristics.   As previously noted, Sgt. Blazer investigated the murder, and admitted that the photograph was a still surveillance photograph of the back of a person's head. J.A. 519, 748.   The facts, even in the

---

[10] *See also supra* Part III.

aggregate, do not suggest that it is more likely than not that Mr. Moore was involved in the murder of Jason Schwindler. The government did not meet even the preponderance of the evidence standard, and a life sentence supported by such scant facts is substantively unreasonable, in addition to being procedurally unreasonable.

V.    THE LOWER COURT COMMITTED OTHER PROCEDURAL ERRORS THAT DENIED APPELLANT RIGHTS GUARANTEED TO HIM BY THE FIFTH AND SIXTH AMENDMENTS

   A.    The Lower Court Erred in Denying Appellant the Opportunity to Review Subpoenaed Materials Prior to Sentencing

Constitutional questions are reviewed by this Court *de novo*. *Myers*, 280 F.3d at 416; *Pitts,* 176 F.3d at 244. The Sixth Amendment provides those charged with a crime, the right to compulsory process. U.S. Const. amend VI. In addition to the right to compel a witness, a person may also compel a document. Federal Rule of Criminal Procedure Rule 17(c) provides for issuance of subpoenas duces tecum, and for pretrial return of subpoenaed materials. This Court has recognized that, "Rule 17(c) implements the Sixth Amendment guarantee that an accused have compulsory process to secure evidence in his favor." *In re Martin Marietta Corp.*, 856 F.2d 619, 621 (4th Cir. 1988) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Further, this Court held that "[e]nforcement of a Rule 17(c) subpoena is governed by the standards established in *United States v. Nixon*, 418 U.S. 683 (1974)". *Id.* As such, a party

43

seeking pretrial production must show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*Nixon*, 418 U.S. at 699.

Rule 17(c)(2) also provides for a remedy if a party served with the subpoena objects to complying: "on motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). This remedy, as any remedy, may only be obtained by a party with standing. With regard to subpoenas duces tecum, a party "has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests." *United States v. Raineri*, 670 F.2d 702 (7th Cir. 1982). In general, if a subpoena is directed a third party, that legitimate interest must be related to a claim of privilege. Occasionally courts have allowed the government to argue a Motion to Quash when the target of the subpoena is a local law enforcement agency when local and federal investigations have been closely intertwined. *See, e.g., United States v. Mora*, 623 F. Supp. 354 (D. Mass. 1985).

1.    No Party With Standing Moved the Court to Quash the Properly Issued Subpoenas

Upon disclosure of Inmate One's identity, less than two weeks prior to the March sentencing date, Mr. Moore undertook a reasonable investigation into Inmate One. This necessarily included trying to obtain records from the institutions where Inmate One had been housed-the District of Columbia Department of Corrections, and the United States Marshal Service, as well as investigating his past outside of institutional confinement. No motion to quash was filed for either of the two subpoenas at issue, although by withholding the subpoenaed materials from Mr. Moore, that result was effectuated. Nevertheless, had the government filed a motion, it did not have standing to challenge a subpoena issued to either agency. The U.S. Marshals Service was not in possession of any records to which the government can assert a privilege, nor did the government have a proprietary interest in those documents. The Marshals are not a local law enforcement agency that had engaged in investigation which formed the basis of the government's allegations against Mr. Moore, and the subpoena was served on the Office of General Counsel for that agency. It was that office and only that office that had standing to argue that compliance with a subpoena would be unreasonable or oppressive. Similarly, the subpoena sent to the Custodian of Records for the District of Columbia Department

45

of Corrections was not been challenged by that agency, and the government lacked a proprietary interest in documents requested from that agency. As such, neither the U.S. Marshal Service nor the D.C. Department of Corrections complied with a validly and properly served United States District Court subpoena. The procedure of sending the materials to the Court, and/or the government, was not proper.

2.    The *Nixon* Standards Were Met and Mr. Moore Should Have Been Permitted to Review the Materials

No motion to quash having been filed, and only days prior to the sentencing hearing, the district court requested that Mr. Moore defend his right to access to the records at issue. In response, Mr. Moore filed a Memorandum with the court, J.A. 780, the government filed a Response, J.A. 221, and Mr. Moore filed a reply. J.A 798. The day before the sentencing hearing, a motions hearing was held, during which, the court found that the subpoenas were improperly issued 17(c) subpoenas based on the following language added to the subpoena by counsel: "[i]n lieu of appearing in person you may comply with this subpoena duces tecum by furnishing the requested information and/or records by mail by the requested date to the attorney listed on the subpoena." J.A. 813, 850-52.[11] Further, the court held that permitting Mr. Moore

---

[11] The government noted that it used the same language on its own trial subpoenas, and that it is not novel language. J.A. 818-20. The court went on to note itself that it is typically "benign," but that the nature of the records sought by Mr. Moore somehow transformed the situation.

access to the records prior to sentencing required a court order prior to the subpoenas being issued. J.A. 815. Based on that finding the trial court granted a protective order (as the government requested), to the extent that the subpoenas requested pre-trial production of documents. J.A. 817, 842. Mr. Moore argued that given the time line of the case, and the allegations that government made against Mr. Moore, he should be permitted to investigate the government's allegations. J.A. 819-21. The court held that whether the defense was permitted to review the requested materials the next day at sentencing depended on whether they were admissible. J.A. 826. However, the *Nixon* requirement is that the items requested are evidentiary. *Nixon*, 418 U.S. at 699. With respect to that requirement, this Court noted, "that is not to say the materials subpoenaed must actually be used in evidence." *In re Martin Marietta, Corp.*, 856 F.2d at 622. Mr. Moore argued that he could not present an argument as to admissibility without reviewing the documents. J.A. 826. The district court disagreed, but ordered the government to review the materials and disclose to the court and Mr. Moore what it thought may be material. *Id.*

As noted, the government called Inmate One to testify against Mr. Moore at sentencing. He testified to several murders and attempted murders in which the government alleges Mr. Moore was involved. Inmate One was a witness of great importance to the government, and to their theory of the crimes they presented at

sentencing.    Mr. Moore had never been charged in any of the above crimes in any court, much less stood trial for them.  As such, the undersigned had limited discovery, limited *Jencks* disclosures which were made two weeks prior to the sentencing hearing, and severely limited time to prepare given that the most substantive government disclosures came just one month prior to sentencing.  In denying Mr. Moore access to the records he subpoenaed,  Mr. Moore was defended at sentencing without needed vital information.

The court denied Mr. Moore the opportunity to review the material based on its interpretation that the subpoenas intended pre-trial review of the documents without a court order.  The court, while acknowledging the *Nixon* factors, did not entertain argument as to whether Mr. Moore could meet those standards.  Although, the records were: evidentiary and relevant as they pertained to Inmate One's credibility, and to the defense that Inmate One lied to protect his own interests;[12] not disclosed even with a subpoena, so they were clearly not procurable by other means; Mr. Moore had no other way to defend himself, but to attack the credibility of Inmate One; and were issued in good faith in order to get information to aid in his defense.

---

[12] In *In re Martin Marietta*, this Court found that the subpoena "was at least a good faith effort to acquire evidence by Pollard for a defense that Martin Marietta hung him out to dry while protecting its own interests." *In re Martin Marietta*, 856 F.2d at 622.

The court based the imposition of a life sentence, in part, on the testimony of Inmate One. As such, the court should have permitted Mr. Moore access to the records he subpoenaed prior to, even if on the morning of, his sentencing hearing. In any event, ordering materials sought via subpoena, disclosed not to Mr. Moore, but to the opposing party, is not proper procedure under *Nixon* or Rule 17(c). The undersigned is unaware of any other case where this occurred. Mr. Moore received a life sentence based almost exclusively on a series of crimes he had not been charged with. He ought have been afforded the right to adequately investigate and defend himself against the allegations presented by the government.

B.    The Lower Court Erred in Considering Testimonial Hearsay at Sentencing in Violation of Mr. Moore's Sixth Amendment Right to Confrontation

Constitutional questions are reviewed by this Court *de novo*. *Myers*, 280 F.3d at 416; *Pitts,* 176 F.3d at 244. The Sixth Amendment explicates that, "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him." U.S. Const. amend. VI. Although *Williams v. New York*, 337 U.S. 241 (1949), holding that hearsay statements may be used at sentencing, has never been overruled, the recent trend in the law treats hearsay statements more strictly. The Supreme Court's decision in *Crawford v. Washington*, 521 U.S. 36 (2004), reexamined the use of hearsay and created a new rule, "[w]here testimonial

49

statements are at issue, the only indicia of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69. It is settled that when testimonial hearsay is involved anything short of calling a witness to testify violates a defendant's Sixth Amendment rights. This case demonstrates the need for confrontation, and not mere reliability, at a sentencing hearing. In a case such as this, permitting a court to sentence Mr. Moore for uncharged conduct, proven solely by hearsay (some of which was double and triple hearsay), and derived from unidentified individuals, offends the Sixth Amendment.

The importance of a defendant's rights to confront the witnesses against him cannot be understated. In *Douglas v. Alabama*, 380 U.S. 415, 418 (1965), the Supreme Court noted, "[o]ur cases construing the (confrontation) clause hold that a primary interest secured by it is the right of cross-examination." Later, in *Davis v. Alaska*, 415 U.S. 308, 316 (1974), the Court explained that, "[c]ross-examination is the principle means by which the believability of a witness and the truth of his testimony are tested." Moreover, in *Crawford*, the Court emphasized that, "the guarantee of confrontation is no guarantee at all if it is subject to whatever exceptions courts from time to time consider fair." *Crawford*, 521 U.S. at 54 (internal quotation marks omitted). Recently, in *Giles v. California*, 554 U.S. 353 (2008), the Court reiterated that the Sixth Amendment, "does not suggest any open-ended exceptions

50

from the confrontation requirement to be developed by the courts." *Id.* at 375 (quoting *Crawford*, 521 U.S. at 54). To ensure the fairness of a defendant's sentence, the confrontation clause must be applied to sentencing proceedings, especially proceedings such as Mr. Moore's sentencing hearing.

Earl Davis was tried and convicted of the 2004 murder of Jason Schwindler before the same court that presided over Mr. Moore's sentencing. At Mr. Moore's sentencing hearing, the court admitted the entire transcript from *United States v. Earl Davis* into evidence along with the exhibit book from that trial. J.A. 284. Further, the court permitted the government to read from a redacted grand jury transcript to support its allegation that Mr. Moore was involved in that murder. J.A. 294-96. The government proffered to the court that Mr. Moore was involved based on DNA evidence, J.A. 292; that Mr. Moore generally resembled the figure from a surveillance photograph of the crime, J.A. 293; that two unnamed acquaintances agreed the figure looked like Mr. Moore, *id.*; and its theory that Mr. Moore went shopping with Mr. Davis four days after the crime, J.A. 296. Mr. Moore was not a party to, witness at, or even interviewed regarding the Davis trial, nor was counsel for Mr. Moore present at the Davis trial. No witnesses, other than Sgt. Blazer testified about the Schwindler murder at Mr. Moore's sentencing, and as such, he had no opportunity to confront the following witnesses against him:

51

(1)    the DNA analyst, even though her only conclusion was that Mr. Moore could not be included or excluded from samples found at the scene;

(2)    the supposed acquaintances that testified before a grand jury, known only to him as Witness One and Witness Two;

(3)    the cashiers from the shopping trip in which the government alleged Mr. Moore participated, although their testimony at the Davis trial, was only that a second black male accompanied Mr. Davis on the trip; or

(4)    any of the other numerous witnesses called at the Davis trial, which took place over the course of seventeen court days.

The district court also admitted heavily redacted portions of Mr. Moore's Bureau of Prisons file into evidence at sentencing. J.A. 653-739. Within those records, it is alleged, by unknown persons, that Mr. Moore was involved in incidents while serving a previous term of confinement. The names of the victims, other suspects, and witnesses were redacted and were never even mentioned at sentencing. Mr. Moore was certainly not afforded any rights during the course of the BOP administrative actions concerning the incidents, and was never criminally charged with crimes resulting from those incidents. At his sentencing hearing, Mr. Moore was denied the opportunity to confront the witnesses against him with regard to the BOP incidents. Neither Sgt. Blazer or the government had any basis of knowledge of the incidents, and no one from BOP testified. Instead, the court received into evidence

heavily redacted records, and permitted the government and Sgt. Blazer to proffer that Mr. Moore was involved in those incidents. J.A. 498, 508.

Sgt. Blazer also testified about the murder of Carlos Webb, another unsolved murder that occurred in Prince George's County, Maryland. Sgt. Blazer was not the investigator on the case, but the court permitted him to testify as to the content of statements of unnamed people made to investigators. Mr. Webb's wife said that the victim said if anything happened to him, "O." J.A. 487. Mr. Webb's mistress denied knowing who "O" was. J.A. 490. Finally, Mr. Webb's friend had no knowledge of the murder at all, and only confirmed what investigators already knew-that Mr. Moore and the victim knew each other. J.A. 492. The names of these people were never made available to Mr. Moore, and grand jury transcripts of their testimony were redacted, thus Mr. Moore had no opportunity to confront them. This repeated use of double and triple hearsay testimony of unidentified witnesses violated Mr. Moore's confrontation clause rights.

C.   The Lower Court Erred in Considering Unreliable Hearsay Testimony at Sentencing and by Admitting Unreliable Evidence in Violation of the Defendant's Due Process Rights

A district court's legal conclusions will be reviewed by this Court *de novo*, while a district court's factual findings will be reviewed for clear error. *United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006).

53

A sentencing court is generally not limited as to information it may consider concerning the defendant for the purpose of imposing a sentence. 18 U.S.C. § 3661. However, the United States Sentencing Guidelines provide that a sentencing court may only consider reliable hearsay. U.S.S.G. § 6A1.3. In *United States v. Hicks*, 948 F.2d 877, 883 (4th Cir. 1991), this Court held that information produced at sentencing must have "some minimal indicium of reliability beyond mere allegation." The use of unreliable hearsay constitutes a violation of a defendant's Fifth Amendment due process rights.

In order to be considered at sentencing, a hearsay statement must be deemed reliable. In *United States v. Wise*, 976 F.2d 393, 403 (8th Cir. 1992), the Court recognized that this determination, "necessarily depends upon the particular circumstances of each case." For instance, this Court has found that hearsay statements corroborated by trial testimony are properly relied upon at sentencing. In *United States v. Roberts*, 881 F.2d 95, 106 (4th Cir. 1989), a police officer's testimony, found to be of "questionable reliability," was corroborated by testimony at trial, and deemed reliable.

Hearsay statements of questionable reliability that have no corroboration have been found to lack the sufficient indicia of reliability needed to be considered at sentencing. In *United States v. Fennell*, 65 F.3d 812, 813-14 (10th Cir. 1995), hearsay

54

statements lacked sufficient indicia of reliability because they were not made under oath, nor in the presence of the testifying witness, and were not corroborated. Even statements that have been corroborated can be found lacking of sufficient reliability. For instance, in *United States v. Cammisano*, 917 F.2d 1057, 1061-62 (8th Cir. 1990), although the hearsay statements at issue had been corroborated the Court found that because the statements constituted triple hearsay, they lacked the requisite indicia of reliability.

As noted previously, the court permitted the use of heavily redacted grand jury transcripts regarding the murder of Carlos Webb. The murder was unsolved, and Sgt. Blazer testified as to statements of unnamed individuals who supposedly knew Mr. Webb. J.A. 287-91. [13] In addition, the court permitted heavily redacted BOP records to be admitted as evidence at sentencing. No BOP personnel testified, nor did the government attempt to authenticate the records. Yet the court admitted them in their redacted form, and used them to supported its imposition of a life sentence.[14] J.A.

---

[13] As previously discussed, *see supra* Part IV.B, with regard to procedural unreasonableness, the court found that Mr. Moore was involved in "murder." J.A. 566. It is entirely unclear as to what murder the court was referring, and thus unclear as to what findings so convinced the court.

[14] It should be noted that the court found only that the BOP records indicated Mr. Moore was dangerous. J.A. 567. The court failed to make any specific findings with regard to the BOP incidents individually, or as a whole.

567.

With regard to the murder of Jason Schwindler, the court based its finding that

Mr. Moore was involved based solely on unreliable hearsay. First, the government

proffered that two acquaintances of Mr. Moore testified at a grand jury proceeding

that a grainy surveillance photograph of the back of a person's head looked like Mr.

Moore. J.A. 294-95. The identity of the witnesses was never disclosed. Simply

testifying, under oath, that the back of someone's head looked like Mr. Moore put

their credibility in question. However, the court stated that it was satisfied that Mr.

Moore was involved in the murder. J.A. 563. The court added that it based its finding

on the receipts from the shopping trip. *Id.* While it is unclear what about the trip or

the receipt convinced the court that Mr. Moore was involved in murder, the evidence

of the receipt was unreliable. The government proffered, using the transcript, and

exhibits from the Davis case, that a Nordstrom receipt was found at Earl Davis'

girlfriend's apartment. J.A. 296. Further, the government proffered that a detective

testified at the Davis trial that a similar receipt from the same day and close to the

same time was found in Mr. Moore's girlfriend's car. *Id.* Regardless of the

government's theory of how that receipt implicates Mr. Moore in a murder, the court

simply mentioned the existence of the receipt when finding that Mr. Moore was

involved. J.A. 563. Finally, the fourth item that the court mentioned to support its

finding that Mr. Moore was involved in the murder, was DNA evidence. *Id.*  The government admitted during its proffer that Mr. Moore could not be excluded or included from the DNA evidence at the scene of the Schwindler murder. J.A. 287. However, the court agreed to take it into consideration when sentencing Mr. Moore, J.A. 288, and indeed used it to support it findings. J.A. 563.  As previously noted, the same court held that the same DNA evidence could not be presented at the Davis trial, noting that without statistics a finding that a person could not be included or excluded was not relevant. *Davis*, 602 F.Supp.2d at 679.  Yet, at Mr. Moore's sentencing, it was apparently enough to convince the court that he was involved in the murder of Mr. Schwindler.

The court should not have admitted the evidence detailed above.  It was unreliable, and its consideration by the court violated Mr. Moore's Fifth Amendment right to due process.  The court's reliance on this unreliable evidence, particularly given the severe sentence imposed, further violated Mr. Moore's due process rights.

VI.   THE LOWER COURT ERRED IN SENTENCING APPELLANT AS AN ARMED CAREER CRIMINAL SINCE HIS PRIOR CONVICTIONS WERE NEITHER PLED IN THE INDICTMENT NOR PROVEN TO A JURY BEYOND A REASONABLE DOUBT

This Court reviews challenges to sentences based upon *Apprendi*, *de novo*. *United States v. Mackins*, 315 F.3d 399, 405 (4th Cir. 2003).

57

An indictment must contain the elements of the offense charged and fairly inform a defendant of the charge against which he must defend. *See Hamling v. United States*, 418 U.S. 87, 117 (1974).  Similarly, Federal Rule of Criminal Procedure 7 requires that the indictment be a "plain, concise and definite written statement with the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  The Supreme Court has recognized the indictment's role in warning a defendant of facts that may enhance his punishment upon conviction. *See, e.g., Jones v. United States*, 526 U.S. 227 (1999).

In *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), the Supreme Court held, in a five-to-four decision, that an indictment in an illegal reentry case need not allege a defendant's prior "aggravated felony" conviction in order for a district court to sentence the defendant to an "enhanced" sentence under 8 U.S.C. §1326(b)(2) based on the defendant's prior conviction. *Id.* at 247.  The majority held that §1326(b)(2) merely created a "sentencing factor" that need not be pleaded in the indictment in order to result in an enhanced sentence based on a defendant's prior "aggravated felony" conviction. *Id.* at 243. Justice Scalia, joined by Justices Stevens, Souter and Ginsburg, dissented, finding that §1326(b)(2) was not merely a "sentencing factor" but, rather was a separate offense. *Id.* at 271 (Scalia, J., dissenting).  As a result, the fact of a defendant's prior conviction must be pleaded

58

in the indictment in order for a district court to impose an "enhanced" sentence above the two-year maximum sentence provided for by 8 U.S.C. §1326(a). *Id.* The same logic relied upon in the *Almendarez-Torres* dissent applies to Mr. Moore's case.

After the Supreme Court's decisions in *Blakely* and *Booker*, any "sentencing enhancement" that increases a defendant's sentence beyond the statutory maximum must be stipulated to by the defendant or proven beyond a reasonable doubt to a jury. In *Blakely*, the Court again repudiated several of the basic premises of *Almendarez-Torres* and extended the reach of *Apprendi* by holding that *Apprendi* does not only apply to findings that extend a sentence beyond a statutory maximum. The Court explained that "the 'statutory maximum' for [*Apprendi*] purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303. The Court's definition of the "statutory maximum" sentence in *Blakely* is not limited to the maximum sentence identified by the legislature in a criminal statute. Instead, the sentencing court is limited to the highest sentence authorized by facts found by the jury or admitted by the defendant at a plea hearing, whether those facts may be sentencing factors or the elements of the crime listed by the legislature, and whether the maximum sentence may be stated in sentencing guidelines or in a statute.

Finally, in *Shepard v. United States*, 544 U.S. 13 (2005), the continued vitality

of *Almendarez-Torres* was put directly at issue by Justice Thomas:

> *Almendarez-Torres*, like *Taylor*, has been eroded by this Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that *Almendarez-Torres* was wrongly decided . . . Innumerable criminal defendants have been unconstitutionally sentenced under the flawed rule of *Almendarez-Torres*, despite the fundamental imperative that the Court maintain absolute fidelity to the protections of the individual afforded by the notice, trial by jury, and beyond-a reasonable-doubt requirements.

*Id.* at 27-28 (Thomas, J., concurring in part) (internal quotation and citations omitted).

In Mr. Moore's case, the existence and separate nature of his previous convictions were not pleaded in the indictment, nor were they presented to the jury. The original Presentence Report counted only two prior convictions for sentence calculation purposes. J.A. 594. As such, the report found that Mr. Moore was in criminal history category III, that his adjusted offense level was twenty-four, yielding a guideline range of 63-78 months. J.A. 596. In response to the government's objections to the report, a second report was prepared. The second report found three qualifying armed career criminal offenses elevating Mr. Moore's adjusted base offense level to thirty-three, and his criminal history category to four. JA. 611. The resulting guideline range was 188-235 months. Pursuant to 18 § U.S.C. 924(e)(1), the statutory minimum sentence increased to fifteen years, and the statutory maximum increased to life imprisonment. *Id.*

60

Inasmuch as the continued precedential value of *Almendarez-Torres* is open to question it is respectfully submitted that *Almendarez-Torres* is no longer good law. As such, the increase in Mr. Moore's mandatory minimum sentence for his conviction on violations of 18 U.S.C. § 922(g)(1), and 18 § U.S.C. 371 is based on facts found only by the court and not submitted to the jury, and that it therefore violates the Fifth and Sixth Amendments.

## CONCLUSION

For the forgoing reasons, Mr. Moore  respectfully requests that this Court reverse his convictions and sentence, and remand his case to the district court for disposition consistent with this Court's opinion.

## REQUEST FOR ORAL ARGUMENT

Mr. Moore requests oral argument on the matters presented in this appeal.

Respectfully submitted,

_____
MICHAEL E. LAWLOR
GWENDOLYN RUTH WATERS
Lawlor & Englert, LLC
6305 Ivy Lane, Suite 608
Greenbelt, Maryland 20770
(301) 474-3404

61

## CERTIFICATE OF COMPLIANCE

This brief has been prepared in 14-point Times New Roman font. Exclusive of the cover page, table of contents, table of authorities, certificate of compliance, certificate of filing and mailing, and addendum, this brief contains 14,549 words. The undersigned has filed a Motion requesting leave to file an oversized brief.

_____

Michael E. Lawlor

## CERTIFICATE OF FILING AND MAILING

I hereby certify that on this 18th day of January, 2011, I filed with the Clerk's Office of the United States Court of Appeals for the Fourth Circuit the required copies of the foregoing Brief of Appellant and Joint Appendix, and further certify that I served the required copies via first class mail this same date from Richmond, Virginia, to counsel listed below.

The necessary filing and service was performed in accordance with the instructions given me by counsel in this case.

_____

May Serafim
Lantagne Legal Printing, Inc.
801 East Main Street, Suite 100
Post Office Box 2472
Richmond, Virginia 23219-2472
(804) 644-0477

OPPOSING COUNSEL SERVED
Deborah Johnston, Esquire
Christen Sproule, Esquire
Office of the United States Attorney
6500 Cherrywood Lane
Greenbelt, MD 20770

# ADDENDUM

## CONSTITUTIONAL PROVISIONS

**Fourth Amendment to the United States Constitution**

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**Fifth Amendment to the United States Constitution**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**Sixth Amendment to the United States Constitution**

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

## STATUTES AND RULES

### 18 U.S.C. § 9229(g)

(g) It shall be unlawful for any person -

(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

(2) who is a fugitive from justice;

(3) who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));
(4) who has been adjudicated as a mental defective or who has been committed to a mental institution;

(5) who, being an alien -
(A) is illegally or unlawfully in the United States; or
(B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

(6) who has been discharged from the Armed Forces under dishonorable conditions;

(7) who, having been a citizen of the United States, has renounced his citizenship;

(8) who is subject to a court order that -
(A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
(B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that

65

would place an intimate partner in reasonable fear of bodily
injury to the partner or child; and
(C)(i) includes a finding that such person represents a
credible threat to the physical safety of such intimate partner
or child; or
(ii) by its terms explicitly prohibits the use, attempted
use, or threatened use of physical force against such intimate
partner or child that would reasonably be expected to cause
bodily injury; or

(9) who has been convicted in any court of a misdemeanor crime
of domestic violence,
to ship or transport in interstate or foreign commerce, or possess
in or affecting commerce, any firearm or ammunition; or to receive
any firearm or ammunition which has been shipped or transported in
interstate or foreign commerce.

## 18 U.S.C. § 924(e)

(e)(1) In the case of a person who violates section 922(g) of
this title and has three previous convictions by any court referred
to in section 922(g)(1) of this title for a violent felony or a
serious drug offense, or both, committed on occasions different
from one another, such person shall be fined under this title and
imprisoned not less than fifteen years, and, notwithstanding any
other provision of law, the court shall not suspend the sentence
of, or grant a probationary sentence to, such person with respect
to the conviction under section 922(g).

(2) As used in this subsection -

(A) the term "serious drug offense" means -
(i) an offense under the Controlled Substances Act (21 U.S.C.
801 et seq.), the Controlled Substances Import and Export Act
(21 U.S.C. 951 et seq.), or the Maritime Drug Law Enforcement
Act (46 U.S.C. App. 1901 et seq.) for which a maximum term of
imprisonment of ten years or more is prescribed by law; or

66

(ii) an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law;

(B) the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that -
(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another; and

(C) the term "conviction" includes a finding that a person has committed an act of juvenile delinquency involving a violent felony.

## 18 U.S.C. § 3553(a)

(a) Factors To Be Considered in Imposing a Sentence.— The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

67

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

(i) issued by the Sentencing Commission pursuant to section 994 (a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28); and

(ii) that, except as provided in section 3742 (g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994 (a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28);

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission pursuant to section 994 (a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28); and

(B) that, except as provided in section 3742 (g), is in effect on the date the defendant is sentenced.[1]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

**18 U.S.C. § 3661**   Use of information for sentencing

No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

## Federal Rule of Criminal Procedure 17(c)

Rule 17. Subpoena

(c) Producing Documents and Objects.

(1) In General.

A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

(2) Quashing or Modifying the Subpoena.

On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.

(3) Subpoena for Personal or Confidential Information About a Victim.

After a complaint, indictment, or information is filed, a subpoena requiring the

69

production of personal or confidential information about a victim may be served on a third party only by court order. Before entering the order and unless there are exceptional circumstances, the court must require giving notice to the victim so that the victim can move to quash or modify the subpoena or otherwise object.

**U.S.S.G §6A1.3.**   Resolution of Disputed Factors (Policy Statement)

(a) When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

(b) The court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P.