No. 10-4456

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

v.

OPIO DIARRA MOORE,

Appellant.

*Appeal from the United States District Court for the
District of Maryland, Southern Division
Honorable Roger W. Titus, District Judge*

BRIEF OF APPELLEE
UNITED STATES OF AMERICA

Rod J. Rosenstein
United States Attorney

Emily N. Glatfelter
Deborah A. Johnston
Assistant United States Attorneys
6500 Cherrywood Lane
Greenbelt, Maryland 20770
(301) 344-4236
Attorneys for the Appellee

June 23, 2011

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.  Facts Related to the Defendant's Offenses of Conviction . . . . . . . . . . . . . 3

II.  Facts Related to the Defendant's Motion to Suppress . . . . . . . . . . . . . . . . 7

III.  Facts Related to the Defendant's Sentencing . . . . . . . . . . . . . . . . . . . . . . 9

    A.  The Presentence Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.  The Sentencing Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.  Evidence Presented Regarding the
            Defendant's History and Characteristics . . . . . . . . . . . . . . . . 11

            a.  The Defendant's Violent Behavior in Prison . . . . . . . . 11

            b.  The Defendant's Violent Behavior After Release . . . . 14

                i.  Murder of Jason Schwindler . . . . . . . . . . . . . . 14

                ii.  Murders for Hire . . . . . . . . . . . . . . . . . . . . . . . 20

                iii.  Murder of Carlos Webb . . . . . . . . . . . . . . . . . . 23

                iv.  Other Criminal Conduct . . . . . . . . . . . . . . . . . . 25

        2.  The District Court's Imposition of the Sentence . . . . . . . . . 27

IV.  Facts Related to the Defendant's Pretrial Subpoenas . . . . . . . . . . . . . . . . 31

-i-

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

I.    THE DISTRICT COURT PROPERLY DENIED
      THE DEFENDANT'S MOTION TO SUPPRESS
      EVIDENCE OBTAINED FROM A VALID
      SEARCH OF A VEHICLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

      A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

      B.    The Search of the Vehicle Was Justified under the
            Automobile Exception to the Warrant Requirement  . . . . . . . . . . . 37

II.   THE COURT'S IMPOSITION OF A SENTENCE
      WITHIN THE STATUTORY MAXIMUM
      WAS PROCEDURALLY SOUND AND
      SUBSTANTIVELY REASONABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

      A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

      B.    The District Court Committed No Procedural
            Errors When it Calculated the Sentencing Guidelines
            and Imposed a Variant Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      C.    The Court's Imposition of a Sentence of
            Life Imprisonment Was Reasonable  . . . . . . . . . . . . . . . . . . . . . . 47

      D.    The Defendant's Constitutional Claims Regarding
            Sentencing Are Foreclosed by Well-established Law  . . . . . . . . . . . 50

            1.    The District Court Properly Relied
                  Upon the Undisputed Criminal Convictions
                  Set Forth in the Presentence Report . . . . . . . . . . . . . . . . . . . 50

            2.    The Court's Consideration of Uncharged
                  Conduct Did Not Violate the Defendant's

Constitutional Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

3.　The Court's Consideration of Hearsay
Information, Which the Court Determined
To Be Reliable, Did Not Violate the
Defendant's Constitutional Rights . . . . . . . . . . . . . . . . . . . . 55

III.　THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
BY LIMITING THE DEFENDANT'S ACCESS TO
INFORMATION OBTAINED BY IMPROPERLY
ISSUED RULE 17(C) SUBPOENAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

A.　Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

B.　The District Court Properly Exercised
Its Discretion When It Limited the Defendant's
Access to Information Obtained by Improperly
Issued Rule 17(c) Subpoenas . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . 66

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998) . . . . . . . . . . . . . 10, 51

*California v. Acevedo*, 500 U.S. 565 (1991) . . . . . . . . . . . . . . . . . . . . . . . 37, 39

*Carroll v United States*, 267 U.S. 132 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . 37

*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . 39

*Gall v. United States*, 552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 47

*Illinois v. Gates*, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Illinois v. Krull*, 480 U.S. 340 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Ornelas v. United States,* 517 U.S. 690 (1996) . . . . . . . . . . . . . . . . . 36, 38, 41, 42

*Shepard v. United States*, 544 U.S. 13 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Taylor v. Farmer*, 13 F.3d 117 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Benkahla*, 530 F.3d 300 (4th Cir. 2008) . . . . . . . . . . . . . . . . . 53

*United States v. Bowman*, 926 F.2d 380 (4th Cir. 1991) . . . . . . . . . . . . . . 56, 60

*United States v. Brookins*, 345 F.3d 231 (4th Cir. 2003) . . . . . . . . . . . . . . . . . 38

*United States v. Bullock*, 94 F.3d 896 (4th Cir.1996) . . . . . . . . . . . . . . . . . . . . 37

*United States v. Caro*, 597 F.3d 608 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 64

*United States v. Cheek*, 415 F.3d 349 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . 51

*United States v. Diosdado-Star*, 630 F.3d 359 (4th Cir. 2011) . . . . . . . . . . . . . 50

-iv-

*United States v. Fisher*, 502 F.3d 293 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Fowler,* 932 F.2d 306 (4th Cir.1991) . . . . . . . . . . . . . . . . . . 60

*United States v. Grubbs*, 585 F.3d 793 (4th Cir. 2009) . . . . . . . . . . . . . 53, 54, 55

*United States v. Han*, 74 F.3d 537 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Hernandez-Villanueva*, 473 F.3d 118 (4th Cir. 2007) . . . . . . . 49

*United States v. Hurwitz*, 459 F.3d 463 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . 38

*United States v. Jones*, 31 F.3d 1304 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . 53

*United States v. Kelly*, 592 F.3d 586 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . 37

*United States v. Little*, 61 F.3d 450 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . 47, 49

*United States v. Love,* 134 F.3d 595 (4th Cir.1998) . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Milam*, 443 F.3d 382 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . 52

*United States v. Morace*, 594 F.3d 340 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . 44

*United States v. Morin*, 437 F.3d 777 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . 58

*United States v. Nixon*, 418 U.S. 683 (1974) . . . . . . . . . . . . . . . . . . . . . 36, 61, 62

*United States v. Ortiz*, 422 U.S. 891 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Perez*, 609 F.3d 609 (4th Cir. 2010) . . . . . . . . . . . . . . . 43, 47, 49

*United States v. Powell*, _ F.3d _, 2011 WL 1797893 (4th Cir. 2011) . . 55, 56, 60

*United States v. Richardson*, 607 F.3d 357 (4th Cir. 2010) . . . . . . . . . . . . . . . 62

*United States v. Robinson*, 275 F.3d 371 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . 38

*United States v. Ross*, 456 U.S. 798 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Terry*, 916 F.2d 157 (4th Cir. 1990) . . . . . . . . . . . . . . . . . . . . 57

*United States v. Thompson*, 421 F.3d 278 (4th Cir. 2005) . . . . . . . . . . . . . . . . . 52

*United States v. Uzenski,* 434 F.3d 690 (4th Cir. 2006) . . . . . . . . . . . . . . . . 36, 61

*United States v. Watts*, 519 U.S. 148 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Wilkinson*, 590 F.3d 259 (4th Cir. 2010) . . . . . . . . . . . . . . . . . 57

*United States v. Williams*, 10 F.3d 910 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . 58

*United States v. Wilson,* 484 F.3d 267 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . 36

*Wyoming v. Houghton*, 526 U.S. 295 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## STATUTES

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2

18 U.S.C. § 922(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 39, 50

18 U.S.C. § 924(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9, 35, 50, 51

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3661 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

18 U.S.C. § 3742(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## OTHER AUTHORITIES

Fed. R. Crim. P. 17(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Evid. 1001(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

D.C. Code § 7-2506.01 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 39

## STATEMENT OF JURISDICTION

A federal grand jury indicted the defendant for possessing ammunition after a felony conviction, in violation of 18 U.S.C. § 922(g)(1), and conspiracy to possess ammunition after a felony conviction, in violation of 18 U.S.C. § 371. JA 10-12.[1] The district court had jurisdiction over this case pursuant to 18 U.S.C. § 3231. A jury convicted the defendant, and the district court sentenced the defendant to life imprisonment, entering its judgment on April 29, 2010. JA 8. The defendant filed a timely notice of appeal. JA 7, 587. This Court has jurisdiction over the defendant's appeal pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.  Whether the district court properly denied the defendant's motion to suppress evidence, where the evidence was recovered from the defendant's vehicle and law enforcement had probable cause to stop the defendant in his vehicle.

II. Whether the district court's imposition of a sentence within the statutory maximum was procedurally and substantively reasonable and constitutional.

---

[1]  All citations to the Joint Appendix are denoted as "JA" followed by the page number; all citations to the Supplemental Joint Appendix are denoted as "SJA" followed by the page number.

-1-

III.   Whether the district court abused its discretion in limiting the defendant's

access to records obtained through pretrial subpoenas, where the defendant

did not seek the court's authorization pursuant to Fed. R. Crim. P. 17(c) to

issue the subpoenas; the court found that the defendant sought the

records in furtherance of a "fishing expedition"; and the court nevertheless

ensured that the defendant obtained documents that might be impeaching of

the government's witnesses at the sentencing hearing.

## STATEMENT OF THE CASE

On April 28, 2008, a grand jury returned a two-count indictment charging

defendant Opio Moore with possessing ammunition after a felony conviction, in

violation of 18 U.S.C. § 922(g)(1), and conspiracy to unlawfully possess

ammunition after a felony conviction, in violation of 18 U.S.C. § 371.  JA 10-12.

The defendant pleaded not guilty and proceeded to trial.  JA 3.  Prior to trial, the

defendant filed a motion to suppress the ammunition recovered from the vehicle he

was driving on August 30, 2006.  JA 13-16.  After reviewing the parties' pleadings

and holding an evidentiary hearing, the district court denied the defendant's

motion.  JA 4, 27-66.  A jury trial commenced on December 2, 2008, and ended on

December 5, 2008, when the jury returned a guilty verdict on all counts.  JA 4.

After considering the parties' sentencing memorandums and holding a day-long

hearing, the court determined that the defendant was an Armed Career Criminal

pursuant to 18 U.S.C. § 924(e), and sentenced the defendant to life imprisonment.

JA 8. This appeal followed.

## STATEMENT OF FACTS

**I.      Facts Related to the Defendant's Offenses of Conviction**

On August 30, 2006, at approximately 11:00 a.m., a team of agents from the

Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) set up surveillance

on the Realco gun store in Prince George's County, Maryland. JA 31-32, 79.

Realco was identified as a dealer that was selling a high volume of guns and

ammunition that were being illegally trafficked from Maryland into Washington,

D.C. JA 30, 76. Although the surveillance did not focus on particular individuals,

the surveillance team paid particular attention to vehicles with Washington, D.C.

license plates at the Maryland gun store. JA 31, 80. Special Agent Jeffrey

McLoughlin was part of the surveillance team that day. JA 31, 79. Agent

McLoughlin had over ten years of experience serving as a special agent with ATF

and was assigned to a firearms trafficking task force. JA 30, 73-74. In that

capacity, he had previously visited Realco on official business and had conducted

surveillance on Realco approximately a hundred times. JA 31.

Around 5 p.m., Agent McLoughlin observed a green minivan enter the

-3-

Realco parking lot at the same time a Jeep pulled into an adjacent parking lot, close
to Agent McLoughlin's vehicle. JA 32, 81. The minivan had Maryland license
plates; the Jeep had D.C. license plates. JA 84. The female driver of the minivan
then exited her vehicle and walked over to the Jeep in the adjacent parking lot,
where she engaged in a conversation with the driver of the Jeep, later identified as
the defendant, Opio Moore. JA 32-33, 81, 134. After conversing with the driver
of the Jeep, the female walked directly into the Realco gun store. JA 32, 34, 82.
Less than five minutes later, the female emerged from Realco carrying a small,
plastic, black bag. JA 32-34, 83. The female was holding the top of the black bag.
JA 43, 59, 92. The bag drooped from the weight of the object inside it, which
appeared to be a heavy, square-like object. JA 32-33, 92. Over a four-year period,
Agent McLoughlin had stopped "a hundred or so" people who had purchased items
from Realco. JA 133. In each instance, the agents had recovered either guns or
ammunition. JA 133-34. Based on a combination of his experience and the size,
shape, and weight of the object in the black bag, Agent McLoughlin believed that
the black bag contained a box of ammunition. JA 32-33, 133-34. Based on his
training and experience, Agent McLoughlin further believed that the female was a
straw purchaser of ammunition for the driver of the Jeep. JA 134. Agent
McLoughlin reported his observations over the radio as the aforementioned events

-4-

unfolded.  JA 34, 82.

After the female walked out of Realco, she got into her minivan.  JA 34, 83.

The minivan and Jeep then left their respective parking lots at the same time and

began driving down Marlboro Pike towards the District of Columbia.  JA 34-35,

83-84.

The surveillance team followed the minivan and the Jeep to a convenience

store parking lot that was approximately a quarter to a half-mile down the road

from the Realco gun store.  JA 35, 144-45.  The convenience store was located in a

strip mall.  JA 145.  The minivan and Jeep pulled into the parking lot and parked

close to one another.  JA 35, 148.  Special Agent Tuveson was parked closest to

the vehicles and observed a transaction that occurred between the drivers of the

minivan and Jeep.  JA 35-36, 86-87, 145, 148-54, 157-59.  He reported his

observations of the transaction over the radio to the other members of the

surveillance team.  JA 172.  Specifically, Agent Tuveson observed the defendant

exit the Jeep, with cash in his hand, and walk over to the driver's side window of

the minivan.  JA 148-49, 159.  Tuveson further observed the defendant hand the

cash to the female driver of the minivan, who in exchange, handed Moore the

black, plastic bag.  JA 149, 159.  Like McLoughlin, Tuveson also had previously

conducted surveillance of Realco and observed similar black, plastic bags,

containing heavy square objects, which later were found to contain boxes of
ammunition.  JA 141, 150-51.  Based upon his training and experience, Agent
Tuveson also believed that the black bag he observed that day contained a box of
ammunition.  JA 150-51.  Tuveson then observed the defendant carry the black bag
back to his Jeep.  JA 151-52, 159.  The defendant opened the rear passenger door
of the Jeep and appeared to do something in the rear passenger compartment.  JA
152.  Approximately a minute later, the defendant emerged from the Jeep without
the black bag, closed the door, and returned to the driver's side of the Jeep.  JA
152-53, 159.  A young male, who had been in the minivan, then entered the front
passenger seat of the Jeep.  JA 153.  The Jeep then pulled out of the parking lot and
drove westbound towards Washington, D.C.  JA 154, 159-60.  The minivan also
left the parking lot, but drove eastbound, further into Maryland.  JA 154, 160.  The
agents followed the Jeep, which they believed now contained the black bag of
ammunition.  JA 88, 154.

Law enforcement officers conducted a traffic stop of the Jeep soon after it
crossed the state line and traveled into D.C.  JA 154-55.   The defendant was in the
driver's seat and a boy, approximately nine to eleven years old, was in the front
passenger seat of the vehicle.  JA 155, 189-90.  Detective John Hendrick of the
Metropolitan Police Department in Washington, D.C. searched the Jeep.  JA 190-

-6-

91.  During his search, he found a black, plastic bag underneath the rear passenger seat, in a small compartment, which is only visible when the seat is lifted up and pulled forward.  JA 191-94, 199-200.  The black bag appeared to be the same size, shape, and weight of the bag that McLoughlin and Tuveson had observed earlier. JA 92, 171.  The agents opened the bag and confirmed that, indeed, the bag contained a box of .40 caliber ammunition.  JA 91-92, 191-92.  Law enforcement officers photographed the vehicle and location of the ammunition in the car prior to recovering it.  JA 198-99.  After taking custody of the black bag and the box of ammunition that it contained, Detective Hendrick stayed at the scene with the young boy until someone came to pick him up approximately an hour later.  JA 195.

At trial, Opio Moore was identified as the driver of the Jeep who had waited for the female in the parking lot adjacent to the gun store, who paid the female for the ammunition in the convenience store parking lot, and who then drove the Jeep into Washington, D.C., where the ammunition was recovered from the Jeep during the traffic stop.  JA 93, 155, 190.

## II.    Facts Related to the Defendant's Motion to Suppress

On June 26, 2008, the defendant filed a motion to suppress evidence obtained from the search and seizure that occurred when officers stopped him on

-7-

August 30, 2006.  JA 13-16.  The defendant argued that the police officers acted

without a warrant and failed to establish reasonable articulable suspicion for the

stop and probable cause for the subsequent frisk, search, and seizure of evidence

from the defendant.  JA 14.  As a result, according to the defendant, the evidence

obtained in the search of his Jeep should be suppressed.  JA 15.  The government

filed a response.  JA 17-22.  On November 26, 2008, the court held a pretrial

hearing.  JA 27-68.  After reviewing the pleadings submitted by the parties,

considering the evidence presented by the government, and hearing oral argument,

the court denied the motion to suppress, concluding that the stop and search/seizure

were supported by probable cause.  JA 65.  In denying the defendant's motion, the

court explained that the officers observed a conversation between the defendant

and a black female in the parking lot of the Realco gun store, after which the

female entered the store.  JA 65.  Once the female exited the store, the officers

watched the two individuals drive separate vehicles to a different location, where

they observed "an exchange of cash for the heavy plastic bag, which was consistent

with ammunition."  JA 65.  Finally, the officers saw the defendant's vehicle drive

into D.C. where it was illegal at that time for him to possess ammunition.[2]  JA 65.

Based on these facts, the court concluded that there was "adequate probable cause

---

[2]*See* D.C. Code § 7-2506.01 (2008).

-8-

to make a stop of the defendant's vehicle." JA 65.

## III.    Facts Related to the Defendant's Sentencing

### A.    The Presentence Report

Prior to sentencing, a United States Probation Officer prepared a Presentence Report (PSR). JA 589-615. The PSR determined that, because the defendant had three prior convictions for serious drug offenses, the defendant was an Armed Career Criminal (ACC), subject to a minimum term of 15 years imprisonment and a maximum term of life imprisonment on Count One, pursuant to 18 U.S.C. § 924(e). JA 608, 610, 611. The PSR further calculated the defendant's applicable advisory guidelines range to be 188 to 235 months on Count One. JA 611. The government filed a sentencing memorandum requesting an upward variance based upon application of the factors enumerated in 18 U.S.C. § 3553(a). JA 622-779. Specifically, the government asked the court to impose the statutory maximum sentence – life imprisonment. JA 622. The defendant also filed a sentencing memorandum. JA 616-20.

### B.    The Sentencing Hearing

On April 22, 2010, after reviewing the parties' submissions, the court held a day-long sentencing hearing. JA 249-580. During the hearing, the court confirmed that the parties had had an opportunity to review the PSR prepared by

-9-

the probation officer.  JA 263.  After determining that there were no factual

disputes as to the contents of the PSR, the court adopted its findings of fact.  JA

264.

The court next addressed the PSR's classification of the defendant as an

ACC.  The defendant objected to his designation as an ACC on two grounds.  JA

265.  First, the defendant argued that *Almendarez-Torres v. United States*, 523 U.S.

224 (1998), had been overruled by  *Apprendi v. New Jersey*, 530 U.S. 466 (2000),

and its progeny, and therefore, the defendant's prior convictions needed to be

presented to a jury and found beyond a reasonable doubt.  JA 265.  Second, the

defendant argued that a jury needed to find that the three convictions were incurred

on separate occasions.  JA 265-66.  The court overruled the defendant's objections,

concurring with the findings in the revised PSR and finding that the objections ran

counter to binding Fourth Circuit precedent, as detailed in the government's

submission to the probation officer.  JA 267, 602.

The court next calculated the applicable, advisory sentencing guideline

range.  JA 267-68.  Based upon an offense level of 33 and Criminal History

Category IV, the court found the advisory sentencing guidelines range to be 188 to

235 months.  JA 268.  The court acknowledged during the hearing that the

guidelines range was advisory and basically functioned as a recommendation to be

-10-

considered in concert with the factors enumerated in 18 U.S.C. § 3553(a).  JA 268,

560.  The court then heard evidence regarding the application of the § 3553(a)

factors.

      1.    <u>Evidence Presented Regarding the
Defendant's History and Characteristics</u>

The government presented testimony and other evidence in support of its

request for a life sentence.  JA 283-529, 653-779; SJA 1-113.  The government's

evidence focused on the history and characteristics of the defendant, providing the

court with information about the defendant's conduct while incarcerated as well as

his post-release conduct.

      a.    <u>The Defendant's Violent Behavior in Prison</u>

The government presented extensive information about the defendant's

conduct within the Bureau of Prisons (BOP), which was well-documented in BOP

records.  JA 496-512, 653-779.  In 1997, the defendant was sentenced to 135

months of imprisonment as a result of federal drug charges.  JA 609.  During his

approximately ten years in federal custody, the defendant was found guilty of at

least *ten* infractions involving violence or threats of violence, as described below.

JA 654, 662, 667, 675, 707, 713, 715, 723, 725, 731.  In fact, as a result of his

violent conduct while incarcerated, he was transferred from three facilities until he

-11-

ended up in BOP's maximum security facility at ADX in Florence, Colorado, which is reserved for the system's most dangerous inmates. JA 498, 663, 668, 691.

While incarcerated at FCI Petersburg, the defendant was found guilty of assault, after stabbing another inmate in the back and in the arm on April 24, 1994. JA 654-60. As a result of this incident, the defendant was transferred to FCI Manchester, Kentucky. JA 660, 663. Shortly after arriving at FCI Manchester, the defendant was found to have engaged in another assault involving an attempted stabbing. JA 663-64. On August 16, 1994, officers interrupted an altercation in the Clay-B Unit of FCI Manchester. JA 663. Witnesses stated that they observed the defendant and another inmate assault the victim. JA 664. Officers recovered four homemade knives in the Clay-B Unit the day after the assault. JA 664. However, because the victim feared retaliation and would not cooperate, no charges were pursued. JA 664-65. As a result of his behavior, the defendant was transferred from FCI Manchester. JA 664, 668.

By January 1995, the defendant was housed in the USP at Terre Haute, Indiana, as a result of a disciplinary transfer. JA 667-68. There, the defendant and two other inmates assaulted another inmate on January 14, 1995. JA 667-72. The inmate identified Moore as a perpetrator. JA 672. Although the investigation confirmed the defendant's participation in the assault, further disciplinary action

-12-

was not pursued due to the lack of substantiating evidence.  JA 672.

On April 12, 1996, the defendant and two other inmates stabbed another prisoner eight times.  JA 674-704.  An investigation revealed that the three inmates, including the defendant, attacked the unarmed victim with sharpened metal instruments.  JA 690.  The victim sustained wounds to his head, arms, chest, and back, which required outside medical treatment.  JA 690.  A few months following this assault, a separation order was issued to keep the defendant and his associate, Andre Brown, separated due to their participation in continuing acts of violence.  JA 690-94.  As a result of the stabbing, the defendant was transferred to BOP's maximum security facility in Florence, Colorado, where he continued to engage in acts of violence.  JA 691, 706-40.  For example, on February 18, 1997, the defendant was found guilty of fighting with another inmate, during which he physically assaulted the inmate.  JA 707.  Similarly, the defendant was found guilty of assaulting an inmate on August 22, 1997.  JA 716.  In addition, on March 19, 2001, the defendant and his associates (Mustafa Zulu a/k/a Andre Brown and Wayne Perry) assaulted another inmate by punching the inmate.  JA 732, 735.  The defendant was later found guilty of assault as a result of this incident.  JA 732.  Significantly, while at ADX in Florence, Colorado, the defendant also assaulted a correctional officer.  JA 726.  In addition to using derogatory terms, the defendant

-13-

threatened to kill the staff member, stating, he "would kill [the staff person] if given the opportunity."  JA 726.

> b.       The Defendant's Violent Behavior After Release

The defendant's violent behavior continued after his release from BOP custody and while he was on supervised release.  Accordingly, the government also presented substantial information about the defendant's conduct following his release from custody.

> i.       Murder of Jason Schwindler

At approximately 1 p.m. on August 6, 2004, a Dunbar Armored Car drove up and parked in front of the BB&T Bank in Hyattsville, Maryland.  SJA 48-49. The driver of the Dunbar vehicle double parked on the street, behind a Jeep Cherokee.  SJA 49, 112.  Unbeknownst to the Dunbar employees inside the armored car, the engine of the Jeep was running and two males dressed in black were lying in wait in the backseat of the Jeep, ready to ambush the Dunbar courier. SJA 33-34, 40-42.  After the Dunbar driver parked the vehicle, the courier, Jason Schwindler, exited the vehicle and began walking up the ramp leading to the bank's front entrance to make a deposit.  SJA 34, 49.  As he neared the front door of the bank, the two, heavily armed males jumped out of the Jeep and gunned him down, killing him a few feet away from the bank's front entrance.  SJA 3, 34, 37-

-14-

40, 43, 49.  The men then stole the money and checks that Schwindler had been carrying.  SJA 25-26, 119.  The two men then attempted to flee the scene in the Jeep that was parked in front of the Dunbar Armored Car.  SJA 40, 50, 52.  Their effort to flee was temporarily thwarted by the Dunbar Armored Car driver who rammed the Jeep and disabled it.  SJA 44, 50, 52, 112-13.  The two men then exited the Jeep and ran to the rear of the bank, where they carjacked a Pontiac Grand Am from a bank customer.  SJA 52, 56-58, 117-18.  The two gunmen committed the murder, robbery, and carjacking in less than 90 seconds.  SJA 116, 118.

Evidence technicians recovered a loaded .40 caliber handgun on the front passenger seat of the Jeep, a black duffel bag containing a 9mm handgun and numerous magazines and rounds of ammunition on the sidewalk next to the Jeep, a baseball cap, and 12 shell casings (both .40 caliber and 9mm rounds).  SJA 64-78, 112-15.  An autopsy performed by the District of Columbia's Office of the Chief Medical Examiner ruled Mr. Schwindler's death a homicide as a result of gunshot wounds to the back, chest, and face.  SJA 80.

During the sentencing hearing, the government presented evidence showing that the defendant was one of the two gunmen responsible for Jason Schwindler's death.  The government presented the evidence in a variety of ways, including

-15-

through sworn witness testimony and evidence introduced in the District of
Maryland case of *United States v. Earl Davis* (RWT-07-199), grand jury
testimony, and witness testimony during the sentencing hearing. JA 281-300, 355-
56, 460-66, 653-779; SJA 1-121.

Forensic analysis of evidence recovered from the crime scene revealed that,
to a reasonable degree of scientific certainty, Earl Davis was the major contributor
of the DNA recovered from the baseball cap left near Jason Schwindler's body, the
steering wheel of the stolen Jeep, and the steering wheel of the carjacked vehicle.
JA 743-44. While the defendant's DNA was excluded as the source of the DNA
recovered from the cap and steering wheels, his DNA profile was consistent with
and could not be excluded as a contributor to the DNA recovered from the .40
caliber and 9mm handguns that were left at the scene. JA 743; SJA 84.

In addition to the forensic evidence, the government presented evidence
demonstrating that the defendant's physical characteristics are consistent with an
image that was captured by the bank's surveillance film depicting one of the two
gunmen. *See* SJA 1-2 (photograph of Opio Moore from 11/2004) and SJA 3-4
(still photograph from bank surveillance film). Indeed, an acquaintance of the
defendant reviewed SJA 3-4 (bank surveillance photograph) and testified in the
grand jury that the person in the photograph looked familiar and looked like the

-16-

back of the defendant.  JA 294, 462-63; SJA 9-11.  Another acquaintance reviewed the same photograph and testified in the grand jury that the man pictured in the bank surveillance photograph looked like the defendant, who has a bald head, full beard, and dark skin.  JA 295, 462-63; SJA 12-17.  In fact, the acquaintance further testified that the clothing of the individual depicted in the photograph looks like something the defendant would wear in terms of a big coat and fitted pants.  JA 295; SJA 13.  The acquaintance then was shown SJA 1-2 (photograph of Opio Moore from 11/2004) and identified the defendant as the person depicted in the bank photograph.  JA 296; SJA 14, 16.

Beyond the crime scene evidence and surveillance photograph, the defendant's conduct after the murder established his participation in the robbery and murder of Jason Schwindler.  Two days after the robbery/murder, on August 8, 2004, Earl Davis and the defendant, accompanied by their respective girlfriends, each paid more than $600 in cash for merchandise from the Nordstrom Rack in King of Prussia, Pennsylvania.  SJA 5-8.  The customer sales representatives who assisted Davis and the defendant that day each stated that the men both had large wads of cash – so large that the cash would not fit inside a wallet.  SJA 95, 109.  The receipts from this shopping trip were recovered from the purses of Davis's girlfriend and the defendant's girlfriend.  The receipt from Davis's Nordstrom

-17-

purchase was recovered from Dana Holmes' apartment on the day of his arrest. SJA 7-8, 88-92. Likewise, the receipt from the defendant's purchase was recovered from his girlfriend's purse the night of Davis's arrest. SJA 5-6, 88-92. Notably, on the night of Davis's arrest, after a search warrant was executed at the apartment Davis shared with his girlfriend, Davis's girlfriend drove to Washington, D.C., where she met with the defendant. SJA 88-89.

Finally, Inmate One testified that after Davis's arrest, the defendant confided in Inmate One that Davis had been arrested, but stated "I know he holdin' water." JA 356. Inmate One understood this to mean that Davis was "not telling.' JA 356. Similarly, the defendant used the same term ("holding water") when he discussed his ammunition charges with Inmate One. JA 357. Moore told Inmate One "he was hoping the young lady he was arrested with would hold water." JA 357. Indeed, she did "hold water" for the defendant with respect to the ammunition trial, as she did not testify.

In addition to robbing and murdering Jason Schwindler with his coconspirator, Earl Davis, the defendant also assisted Davis in planning Davis's escape from jail while he was awaiting trial. On September 5, 2007, the defendant visited Davis at the Prince George's County Department of Corrections. JA 304-06. The visit, which occurred in a small room where the parties were separated by

-18-

plexiglass, was lawfully recorded (both audio and video), pursuant to court orders.

JA 303-05. During the visit the defendant communicated with Davis in several

ways.  JA 306.  At times, the defendant and Davis would speak at a normal volume

of conversation, even yelling at times in order to be heard by one another.  JA 309-

10.  However, when discussing more sensitive matters, such as the escape plan

described below, the defendant and Davis would communicate by whispering and

using hand gestures.  JA 306, 309, 313-15.[3]

        During the visit, the defendant and Davis discussed Davis's plan to escape

from prison.  JA 305-06.  The defendant and Davis discussed the logistics of the

plan – including the need for the accomplice to be armed in the event any law

enforcement officers tried to stop him.  JA 315.  During Davis's description of the

plan, the defendant made a motion with his hands, which looked like he was using

a shoulder weapon (an assault rifle), indicating that the escape accomplice on the

outside of the jail will need to have a firearm in case law enforcement try to stop

them outside of the jail.  JA 306, 315.

        After intercepting this meeting, the FBI contacted the warden of the jail as

well as the U.S. Marshals to implement a plan to prevent Davis's escape and to

_____

        [3]    The government played the video recording for the court during the hearing.
JA 308-19.

-19-

ensure the safety of law enforcement and visitors to the jail.  JA 319.

ii.    Murders for Hire

The government also presented evidence regarding the defendant's agreement and participation in two contract murders.  Specifically, Inmate One identified Moore and his associate Rico Thomas as the individuals who agreed to kill two people in return for a monetary payment.  JA 328-54.  The first murder occurred on January 18, 2007, when Frank Moyler a/k/a Gino died as a result of multiple gunshot wounds in southeast Washington, D.C.  JA 468.  Inmate One testified that the defendant and his associate (Rico Thomas) were hired to kill Gino.  JA 330-31.  Inmate One testified that Gino had previously shot his cousin, and as a result, his cousin was confined to a wheelchair.  JA 331-32, 374.  Inmate One's cousin wanted Gino killed in retaliation for the shooting.  JA 331.  Accordingly, Inmate One hired the defendant and Thomas to kill Gino.  JA 330-32.  Inmate One initially met with Thomas to pass along his cousin's message.  JA 332.  Inmate One told Thomas there was $10,000 for Gino.  JA 333.  Thomas replied that he would "get on top of it" and indicated that he was already in contact with Gino.  *Id.*  After Gino was killed, Thomas contacted Inmate One to tell him "it was done."  JA 333-34.  Thomas also directed Inmate One "to call Cuz and get that," which Inmate One understood to mean call his cousin and get the $10,000.  JA

-20-

334. After speaking with Thomas, Inmate One contacted his cousin and gave him the information. *Id*. Inmate One's cousin indicated that he needed to "check into it and make sure it was done." *Id*. Inmate One's cousin contacted him later and arranged to meet Inmate One off of Eastern Avenue. *Id*. Inmate One picked up Thomas at Clay Terrace and rode together to meet Inmate One's cousin. JA 335. As previously arranged, Inmate One's cousin gave him the $10,000 for the killing. JA 335-36. Inmate One, in turn, gave Thomas the money. JA 336. Inmate One and Thomas then rode back to Clay Terrace, where the defendant was waiting for him in his Jeep. JA 336-37. Inmate One and Thomas met with the defendant, during which time Inmate One observed Thomas split the money in half with the defendant. JA 338.

Inmate One's testimony was corroborated by independent evidence. For example, after interviewing Inmate One, Detective Blazer confirmed that Franklin Moyler, also known as "Gino," was shot to death on January 18, 2007, in southeast Washington, D.C. JA 467-68. Additionally, an analysis of telephone records showed that the defendant and Thomas, and Thomas and Gino were in contact shortly before Gino's death. JA 469-70. Inmate One's account also was consistent with evidence indicating that there were two participants in Gino's murder. JA 470-71. Finally, the Jeep that the defendant was driving when he was arrested for

-21-

unlawful possession of ammunition matched the description of the vehicle

provided by Inmate One.  JA 336-37, 481-82.

Inmate One also described a second contract murder which the defendant

and Thomas agreed to commit, but the victim (Michael Majors, a/k/a Little Mike

a/k/a Mike Little) survived the shooting.   Inmate One testified that his cousin

provided him with a description of Mike Little's address and vehicle and requested

that Mike Little be killed.  JA 347.  Upon receiving this information, Inmate One

again contacted the defendant's associate, Rico Thomas, regarding the proposed

hit.  JA 348.  Inmate One subsequently met with the defendant and Thomas to

"check the address out."  *Id*.  At this time, the defendant and Thomas agreed to kill

Mike Little in exchange for $10,000.  JA 349.  Later, Thomas contacted Inmate

One and said "it's done," which Inmate One understood to mean that Mike Little

had been killed.  JA 349-50.  However, after speaking with his cousin, Inmate One

learned that Mike Little had actually survived the attack.  JA 350-51.  Inmate One

then informed Thomas that Mike Little was alive, and drove with Thomas to meet

with his cousin to collect a reduced fee of $7,000.  JA 350-51.  After receiving the

money, Inmate One went with Thomas to meet with the defendant.  JA 351.

During the meeting, the defendant and Thomas provided details to Inmate One that

were later corroborated by law enforcement.  JA 351-53.  For instance, Inmate One

-22-

testified that Thomas said that when Majors came out of his house early in the morning, they walked up to him and shot him. JA 351. Mike ran and they ran him down and shot him again. *Id.* The defendant said that, at the time of the attack, they were dressed in suits and hats, and therefore it was possible that Mike initially believed them to be Jehovah's Witnesses. JA 352-53. During this conversation, Thomas also stated that the gun jammed during the attack. JA 353.

Inmate One's testimony was corroborated by independent evidence obtained by law enforcement. Detective Blazer was able to confirm that Michael Majors, also known as "Little Mike," survived a shooting that occurred on June 1, 2007, outside of the apartment complex identified by Inmate One. JA 478. Although Michael Majors was initially uncooperative with law enforcement, he later stated that the gun used by the shooters had jammed and that the shooters were wearing suits and ties. JA 480-81. Additionally, an independent witness stated that the shooters fled in a black Impala. JA 479. During 2007, surveillance agents observed the defendant and Thomas driving a black Impala, independently and together, that was registered to Thomas's wife. JA 481; SJA 18.

### iii.    Murder of Carlos Webb

The government also presented evidence regarding the defendant's participation in the murder of Carlos Webb. JA 485-93. On March 18, 2007, at

-23-

approximately 9:30 pm, Webb was found shot to death in Fort Washington, Maryland. JA 485. During the murder investigation, Detective Blazer interviewed the current wife of the victim. JA 487. The wife stated that shortly before the murder, Webb "exited the house rather abruptly" and stated, "If anything happens to me, O." *Id*. After Webb's death, the wife spoke with Tia, the mother of Webb's children, and told Tia what Webb had said. *Id*. Tia stated that she knew "O" as the cousin of "Baby Earl," who the agents knew to be Earl Davis. *Id*. In addition, a friend of Webb told Detective Blazer that the defendant would often call his cell phone to get in touch with Webb, and that the two men frequently attended the same gambling establishment, occasionally leaving and returning to the establishment together. JA 491-92. The friend further stated that shortly before Webb's death, the defendant and Webb were planning a robbery. JA 492. After Webb's murder, the friend feared for his life and sought to obtain a gun to protect himself from the defendant. *Id*. Upon learning this, the defendant later approached the friend, denied any involvement in Webb's murder, and told him that he "had nothing to worry about." JA 492-93.

The statements of Webb's wife and friend were corroborated by independent evidence. During the murder investigation, detectives placed a Crime Solver's poster with Webb's photo in the visitors lobby of the Department of Corrections.

-24-

JA 490. In a recorded phone call between Earl Davis and an associate, the associate mentioned that he "saw Tia's little man's picture on the wall of the visiting room" during an attempted visit. JA 491. This conversation confirmed that Tia knew "Baby Earl" and "O." *Id.* Detective Blazer testified that the defendant's acquaintances "refer to him as O." JA 459. Additionally, an examination of the defendant's telephone records reveals that on March 17, 2007, the day before the murder, the defendant spoke with Davis. JA 489. During that conversation, the defendant stated that "the dude that used to take us to the joint had gotten over on [him]" and that he would "have to take care of it." *Id.* The two men then began to discuss a gambling establishment run by an acquaintance. *Id.* Upon examination of Webb's phone records, Detective Blazer learned that there were numerous phone calls between the defendant and Webb on March 17 and 18. JA 489-90. In fact, the final outgoing call from Webb's phone to the defendant's phone occurred shortly before his murder. JA 490.

### iv.    Other Criminal Conduct

Following his release from BOP custody in 2003, the defendant also participated in numerous burglaries and armed robberies. The government presented evidence of the defendant's participation in these violent acts through the testimony of Inmate Two and Detective Blazer. JA 421-28; 482-84, 493-95. For

-25-

example, Inmate Two testified that he met the defendant while the two men were at the Charles County Detention Center in 2009. JA 420-21. According to Inmate Two, the defendant spoke to him about breaking into the houses of drug dealers. JA 421-22. The defendant told Inmate Two that he would use license plate numbers to find out where potential victims lived, and then "[t]ake a sledgehammer and hit the door to break into the house." JA 423. He also spoke about cutting the alarm systems and kidnapping in order to break into people's houses. *Id*. During one of these conversations, the defendant admitted to burglarizing a home that Inmate Two recognized as belonging to a close family friend. JA 424. The defendant told Inmate Two that the house was located off of St. Barnabas Road, the owner kept a lot of company at the house, and there was a BMW-745 and a pickup truck parked in the driveway. JA 424-25. Additionally, the defendant stated that the owner spent a lot of time at a bar in northeast Washington, D.C. called Uptown, and that after breaking into the owner's home, he found over one hundred thousand dollars in a toolbox. JA 425-26. By referencing these details, Inmate Two recognized the burglary as one that he knew was committed against a family friend. JA 424-26. Moreover, Inmate Two knew that his family friend frequently visited the bar mentioned by the defendant and often kept a large amount of cash from his drug dealing. JA 425-26.

Inmate Two's testimony was corroborated by independent evidence presented at the sentencing hearing. When ATF agents arrested the defendant on the ammunition possession charges in 2006, they found "burglary tools," including "heavy duty construction crowbars," in the trunk of the defendant's Jeep. JA 484. In addition, on March 27, 2007, the FBI seized the defendant's Jeep after interrupting what appeared to be the beginning of an armed robbery or carjacking. JA 482. The defendant was identified as being the owner of the vehicle. *Id.* During a search of the Jeep, FBI agents found a "duffel bag with multiple crowbars, ski mask, gloves, two-way radios," as well as photographs of the defendant and his now wife. JA 483. On a separate occasion, the defendant was stopped by police while driving a Cadillac. JA 484. When the officers searched the backseat of the car, they found a duffel bag with crowbars and sledgehammers. *Id.*

## 2.     The District Court's Imposition of the Sentence

After the government concluded its presentation of evidence and the defendant cross-examined each of the government's witnesses, the defendant was given the opportunity to present testimony but declined to do so. JA 529. After hearing the argument of counsel, the district court proceeded to sentence the defendant. JA 559. First, the court analyzed the section 3553(a) factors. In terms

of the history and characteristics of the defendant, the district court described the

defendant's background as "horrific," noting that "[t]his is a defendant who has

been shown by a preponderance of the evidence to be someone who is dangerous

to persons inside the prison, dangerous to persons outside, has been willing to flout

the law, arrange for persons to be murdered, and is certainly not somebody who

would be adequately punished by a sentence within the guideline range."  JA 571.

Indeed, prior to applying the 3553(a) factors, the court found by a preponderance

of the evidence that the defendant had committed multiple murders, attempted

murders, and burglaries after his release from prison, as evidenced during the

sentencing hearing.  JA 562-66.  The court noted that the evidence the government

presented regarding these incidents was reliable and credible.  JA 565-66.  For

example, the court specifically noted that it found Inmate One's testimony reliable

and credible, in particular, because "he did, where it was  appropriate, indicate

there was not culpability of [the defendant] in certain matters."  JA 565.  In

addition, the court noted that Inmate One provided details about the various crimes

that law enforcement was able to independently corroborate.  *Id*.  The court found

Inmate Two's testimony credible for these same reasons and for the added reason

that Inmate Two had independent knowledge of one of the burglaries described by

the defendant – because it involved the burglary of his relative.  JA 566.  In terms

of the defendant's background, the court stated that it found the defendant's behavior in prison "equally troubling," leading the court to conclude that "there's [a] very significant indication that this is a dangerous man, both in and outside of prison." JA 567.

In terms of the nature and circumstances of the offense, the court found that the offense in this case was "quite serious." JA 568. The court explained that Congress views the crime as serious, particularly when it involves someone with a significant criminal history, for it has authorized a range of sentences "that includes a sentence as high as life in prison." *Id.*

With regard to the need to promote respect for the law and afford adequate deterrence, the court found that the defendant has "repeatedly shown that both inside and outside of prison he has no respect for the law." JA 568. The court explained that the defendant engaged in repeated criminal conduct during his incarceration and upon his release – right up until his arrest in this case – and would only be deterred from future criminal conduct by the imposition of a "significant" jail sentence. JA 568-69. In terms of the need to protect the public from further crimes of the defendant, the district court found that "the public was not very well protected by the last sentence," because upon release the defendant promptly returned to criminal activity. JA 569. Therefore, only a "very significant

-29-

jail sentence" would adequately protect the public from further crimes.  *Id*.

Furthermore, based on the defendant's extensive criminal conduct, the district

court concluded that the best place for the defendant to receive the necessary

educational or vocational training, medical care, and correctional treatment is in

jail.  JA 569-70.

In terms of the need to avoid unwanted sentence disparities among

defendants who have been found guilty of similar conduct, the court noted that the

defendant's background was "among the worst" it had seen.  JA 570.  When

considering the need to provide restitution to the victims of the offense, the district

court ruled that there was little restitution available as to the crime of conviction of

unlawful possession of ammunition.  JA 570.

After analyzing the section 3553(a) factors, the court concluded that a

sentence within the previously calculated advisory guideline range "would be

woefully inadequate."  JA 570-71.  The court noted that a 235-month sentence

would be "very substantially below what is necessary to protect the public" from

someone who is dangerous inside and outside of prison and "has been willing to

flout the law, arrange for persons to be murdered, and is certainly not someone

who would be punished by a sentence within the guideline range."  JA 571.

Accordingly, the court imposed the maximum sentence authorized by statute – life

-30-

imprisonment. JA 572. The court explained that, "[i]n this case, Congress has authorized as high as life. I could not imagine another case for a felon in possession that would justify this level of sentence, but this case has clearly demonstrated that to me." *Id.* In closing, the court added, "[t]his is one of those cases – it's a rare case indeed, but it's one of those cases in which I conclude that if there ever were a case that would justify the maximum amount that Congress has authorized, this is that case." JA 571.

## IV.    Facts Related to the Defendant's Pretrial Subpoenas

Prior to sentencing, and after the defendant had received the government's *Jencks* and other disclosures for the sentencing hearing, the defendant issued several subpoenas for records. JA 230-32, 819-20, 850-53. The first subpoena was issued to the Washington, D.C. Department of Corrections and requested:

> the entire contents of [. . . ] DOC files, including but not limited to: disciplinary records, dates of incarceration, separation orders and visitation lists [. . . ]. In lieu of appearing in person, you may comply with this Subpoena Duces Tecum by furnishing the requested information and/or records by mail by the requested date to the Attorney listed on this subpoena.

JA 812-13, 850.[4] The second subpoena at issue was served on the U.S. Marshals for the Eastern District of Virginia, and requested:

---

[4]    The name of the inmate and any personal identifiers have been redacted in this brief.

-31-

> All file contents for [. . .] from detention in the Eastern District of Virginia, including, but not limited to: disciplinary records, separation orders, visitation lists and phone lists . . . In lieu of appearing in person, you may comply with this Subpoena Duces Tecum by furnishing the requested information and/or records by mail by the requested date to the Attorney listed on this subpoena.

JA 852. Both subpoenas were due on March 29, 2010, which was the date of the sentencing hearing, before the defendant requested and was granted a continuance.[5] JA 7, 812, 850, 852.

The court and government were unaware of the issuance of these subpoenas until the subpoenaed parties contacted the court and government counsel. JA 811-12. The court received a letter from the Attorney General of the District of Columbia on behalf of the Department of Corrections expressing security concerns regarding the defendant's subpoena. JA 810-11. Similarly, the government notified the court that it had received information from another correctional facility, which had concerns regarding the nature and scope of the defendant's

---

[5] Defense counsel issued several other, similar subpoenas and received returns from some of those subpoenas. JA 231-32. For example, defense counsel issued a subpoena to another jail, which complied with his subpoena and provided him with materials that he deemed of no utility. *Id.* Defense counsel also received 12 cds of jail calls several weeks before the hearing. JA 235, 237. While pursuant to the court's order, he provided them to the government, he had them in his possession several weeks prior to the hearing. JA 235, 237, 244. In fact, defense counsel reviewed some of the discs and found nothing relevant on the discs that he reviewed. JA 244. Thus, the issues he raises relate only to the two subpoenas quoted above and included by the defendant in the Joint Appendix at JA 850-53.

subpoena.  JA 811.  The court then held a conference call with the defendant and

the government on April 12, 2010, regarding the propriety of the subpoenas.  JA 7,

811.  At the conclusion of the conference call, the court directed the parties to brief

the propriety of the defendant's subpoenas.  JA 7, 221-27, 780-805, 811.

 The court then held a hearing regarding the subpoenas on April 21, 2010.

JA 806-48.  After reviewing the parties' written submissions and hearing oral

argument, the court determined that the subpoenas issued by defense counsel were

in effect subpoenas for pretrial production of records, and as such, the subpoenas

should have been issued pursuant to the procedures set forth in Fed. R. Crim. P.

17(c) and subjected to court review.  JA 813, 815-16.  The court noted that there

was no application by the defense – *ex parte* or otherwise – seeking authorization

for pretrial production of records.  JA 812, 815.  The court further expressed

concern that these subpoenas were mere "fishing expedition[s]," as defense counsel

indicated that he merely wanted the records "so [he could] go out and interview

people."  JA 261-62, 829.  The court noted that many of the records requested,

such as separation orders, implicated serious security concerns.  JA 843.

 Accordingly, the court fashioned a remedy to permit defense counsel access

to the records that he would have been authorized to subpoena pursuant to Rule

17(c), while limiting access to sensitive information that served no purpose other

-33-

than a fishing expedition.  JA 842-43.  While the court reviewed the records it received and found "little, if anything" that would be useful to the defense, in an abundance of caution, the court also ordered the government to review the records overnight and identify any information that would fall under the government's discovery obligations and/or be relevant to cross-examination.  JA 253-54, 816, 836, 842.  The court further directed defense counsel to provide to the government any other records he already had received pursuant to similarly issued subpoenas.  JA 847-48.  The government reviewed the records and provided information to defense counsel "in an abundance of caution" the same day (April 21, 2010).  JA 238; 254, 260.[6]

## SUMMARY OF ARGUMENT

I.     The district court properly denied the defendant's motion to suppress evidence, as the record clearly demonstrates that the stop was based on ample probable cause.  Based upon their training and considerable experience conducting

---

[6]     After the hearing on April 21, 2010, at approximately 3:30 pm, the government received from defense counsel an additional 12 discs of jail calls that he had obtained via subpoena.  JA 235-37.  The government did not review these discs, as it would have been physically impossible to review all of the calls in the time allotted.  JA 236.  However, the discs were made available to defense counsel and the materials actually included with the discs indicated that defense counsel had the discs for at least two weeks prior to giving them to the government.  JA 237, 258.  In addition, defense counsel conceded that he had reviewed some of the discs.  JA 244.

surveillance at the gun store, the agents had probable cause to believe that the defendant was in illegal possession of ammunition after they observed him exchange cash for a small, plastic bag that another person had carried out of the gun store minutes earlier.

II.    The sentence imposed by the district court was procedurally and substantively reasonable.  Although the court imposed the maximum sentence authorized by statute, it did so after carefully considering the record before it, making detailed findings of fact, and methodically applying the factors enumerated in 18 U.S.C. § 3553(a).  In so doing, the court recognized that imposing a life sentence pursuant to 18 U.S.C. § 924(e) was a rare circumstance.  However, the court appropriately concluded that a life sentence was warranted, because the defendant's "horrific" background – which included violent behavior in prison and his participation in multiple murders before and *after* his possession of ammunition in this case  – indicated that he had no respect for the law, and thus no sentence would adequately deter him.  Accordingly, the court determined that the defendant posed a substantial danger to society and the sentence was necessary to protect the public.  The constitutional claims made by the defendant are meritless under binding precedent, which establishes that the court applied the correct burden of proof and considered appropriately reliable evidence at sentencing.

-35-

III.    The district court did not abuse its discretion in limiting the

defendant's access to records obtained through pretrial subpoenas, where the

defendant did not seek the court's authorization pursuant to Fed. R. Crim. P. 17(c)

to issue the subpoenas; the defendant could not satisfy the test articulated in *United*

*States v. Nixon,* even after reviewing some of the records he sought; and the court

nevertheless ensured that the defendant obtained documents that might be

impeaching of the government's witnesses at the sentencing hearing.

## ARGUMENT

## I.    THE DISTRICT COURT PROPERLY DENIED THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED FROM A VALID SEARCH OF A VEHICLE.

### A.    Standard of Review

Factual findings underlying a motion to suppress are reviewed for clear

error, while the legal determinations are reviewed de novo.  *See United States v.*

*Wilson,* 484 F.3d 267, 280 (4th Cir. 2007) (*citing Ornelas v. United States,* 517

U.S. 690, 699 (1996)).  When a district court denies a defendant's motion to

suppress, this Court reviews the evidence in the light most favorable to the

government.  *See United States v. Uzenski,* 434 F.3d 690, 704 (4th Cir. 2006).  In

reviewing a probable cause determination, the Fourth Circuit considers not only the

evidence before the district court at the suppression hearing, but also relevant

-36-

evidence admitted at trial. *United States v. Han*, 74 F.3d 537, 539 (4th Cir. 1996) (affirming probable cause determination, in part, based on relevant evidence admitted during trial).

### B.     The Search of the Vehicle Was Justified under the Automobile Exception to the Warrant Requirement.

The defendant claims that law enforcement lacked probable cause to stop him and search his vehicle. More specifically, he asserts that law enforcement did not have probable cause to believe that the black bag the agents saw him accept from the driver of the minivan contained ammunition, and that he was prohibited from possessing the ammunition. Def. Br. 19-20. These contentions lack merit.

It is well settled that a warrantless search of a vehicle is constitutional if the officers have probable cause to believe a readily mobile vehicle contains contraband. *Carroll v. United States*, 267 U.S. 132 (1925); *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir.1996) (finding probable cause based upon officer's observations during a traffic stop). In *California v. Acevedo*, the Supreme Court reiterated its opinion in *Carroll* stating: "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." 500 U.S. 565, 580 (1991); *see also United States v. Kelly*, 592 F.3d 586, 592 (4th Cir. 2010). Probable cause is "a fair

probability that contraband or evidence of a crime will be found in a particular

place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[P]robable cause is a fluid

concept – turning on the assessment of probabilities in particular factual contexts –

not readily, or even usefully, reduced to a neat set of legal rules." *Id*. at 232.

The probable cause standard does not:

> require officials to possess an airtight case before taking action. The
> pieces of an investigative puzzle will often fail to neatly fit, and
> officers must be given leeway to draw reasonable conclusions from
> confusing and contradictory information, free of apprehension that
> every mistaken search or seizure will present a triable issue of
> probable cause.

*Taylor v. Farmer*, 13 F.3d 117, 121-22 (4th Cir. 1993). *Accord*, *Ornelas*, 517 U.S.

at 696 (probable cause exists "where the known facts and circumstances are

sufficient to warrant a man of reasonable prudence in the belief that contraband or

evidence of a crime will be found"); *United States v. Hurwitz*, 459 F.3d 463, 473

(4th Cir. 2006); *United States v. Brookins*, 345 F.3d 231, 235 (4th Cir. 2003);

*United States v. Robinson*, 275 F.3d 371, 380 (4th Cir. 2001).

Assuming there is probable cause to search the vehicle, law enforcement

may conduct a warrantless search "that is as thorough as a magistrate could

authorize in a warrant." *United States v. Ross*, 456 U.S. 798, 800 (1982). This

includes a warrantless search of any containers or compartments found in the

vehicle. *See Wyoming v. Houghton*, 526 U.S. 295 (1999) (permitting search of a passenger's purse based solely on probable cause to search vehicle, no further showing of "individualized probable cause" being required); *Acevedo*, 500 U.S. at 565 (no reason to distinguish between warrantless search of vehicles and the containers found within them for Fourth Amendment purposes).

In the instant case, based upon the straw purchase they had observed, law enforcement officers had probable cause to believe that the defendant was prohibited from possessing ammunition – under D.C. Code § 7-2506.01 (2008), which made it illegal for a person to possess ammunition in the District of Columbia absent narrow exceptions, and under federal law (18 U.S.C. § 922(g)), which makes it illegal for felons to possess ammunition.[7] Probable cause is established by the law enforcement observations, which are summarized as

---

[7]     On June 26, 2008 – nearly two years after the defendant's traffic stop – in the landmark case of *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment to the Constitution protects a citizen's right to possess a firearm for private use within the District of Columbia. 554 U.S. 570 (2008). In doing so, the Court declared the District of Columbia's current firearm prohibitions unconstitutional. *Id*. The Supreme Court's recent holding does not render the search and seizure in this case invalid. The exclusionary rule does not apply, where the challenged evidence was obtained by an officer acting in objectively reasonable reliance on a statute, even if that statute was later determined to be unconstitutional. *See Illinois v. Krull*, 480 U.S. 340, 349-50 (1987) (Court refused to apply the exclusionary rule where officer relied upon statute authorizing warrantless searches of automotive parts businesses, which statute was subsequently determined to be unconstitutional).

follows: (1) a minivan, being driven by a woman, pulled into the Realco gun store parking lot in Maryland at the same time that a Jeep, being driven by the defendant with D.C. license plates, entered into an adjacent parking lot; (2) the driver of the minivan then walked over to the Jeep and engaged in conversation with the defendant; (3) immediately afterwards, the woman entered the gun store and came out, several minutes later, with a black, plastic bag containing a heavy, box-like object, which officers believed, based upon their training and experience, to be a box of ammunition; (4) the defendant and the woman drove in tandem to a parking lot several blocks away – out of sight of the gun store – where the defendant gave money to the woman in exchange for the black plastic bag; and (5) the defendant placed the plastic bag into his Jeep and proceeded to drive from Maryland into the District of Columbia, where it was illegal to possess ammunition absent narrow exceptions.  JA 32-35, 81-82, 84, 148-49, 151-54, 159-60.

Consequently, the law enforcement officers then initiated the traffic stop since they had probable cause to believe that contraband, i.e. ammunition, would be found in the defendant's vehicle.  The preceding actions of the defendant and the driver of the minivan established a fair probability that the defendant had conspired with the woman to buy ammunition (contained in the black plastic bag) in exchange for money.  Therefore, the law enforcement officers were justified in

-40-

detaining the defendant once he entered Washington, D.C.

The defendant contends that the officers merely had a hunch that the black plastic bag contained ammunition.  Def. Br. 19-20.  However, that argument is belied by the record, which shows that the agents were virtually certain that the bag contained a box of ammunition based upon their extensive history surveiling the gun store.  As the Supreme Court has explained, "our cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists."  *Ornelas*, 517 U.S. at 700 (*citing United States v. Ortiz*, 422 U.S. 891, 897 (1975)).  The team of law enforcement officers conducting surveillance that day were part of a task force that targets firearms trafficking in Washington, D.C.  JA 30, 74.  They were conducting surveillance at the Realco gun store because Realco had been identified as a dealer that sold a high volume of the firearms that were then moved from Maryland into Washington, D.C.  JA 30-31, 76.  As such, the agents had conducted surveillance at Realco on numerous occasions.  JA 31, 76, 141.  For example, Special Agent McLoughlin, who observed the conversation between the defendant and the driver of the minivan outside of the gun store and then observed the woman leaving the gun store, carrying the black bag with the heavy square object, had conducted surveillance at Realco for four years.  JA 133.  During those four years, his team

-41-

had stopped at least a hundred people who had made purchases at Realco, and each time the agents recovered either firearms or ammunition. JA 133. Accordingly, McLoughlin believed that the black plastic bag contained ammunition, based on "the size, shape, and the heft of the object and, again, given the fact that []the folks [the agents] stopped don't have any other objects besides what we thought, either a gun or ammunition." JA 133-34. Indeed, McLoughlin testified that the conduct in this case was identical to that in another case he investigated involving a straw purchase. JA 134. Similarly, Special Agent Tuveson, who observed the defendant hand the woman cash in exchange for the black plastic bag, testified that he believed the bag contained ammunition based on his training and experience. JA 151. Specifically, Tuveson testified that he had conducted surveillance of Realco on multiple occasions and had "observed the same black plastic bags on numerous occasions and never been wrong with objects that are again consistent with the size, shape, and weight of a box of ammunition." JA 151. Based on their observations in the instant case and their significant experience investigating firearms and ammunition purchases from the same store, the agents had ample probable cause to believe the defendant was illegally in possession of ammunition as a result of the straw purchase. *Compare Ornelas*, 517 U.S. at 700 ("To a layman the sort of loose panel below the backseat armrest in the automobile

-42-

involved in this case may suggest only wear and tear, but to Officer Luedke, who had searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel.").  Because the stop and vehicle search were supported by probable cause, the district court's denial of the suppression motion should be upheld.

## II.    THE COURT'S IMPOSITION OF A SENTENCE WITHIN THE STATUTORY MAXIMUM WAS PROCEDURALLY SOUND AND SUBSTANTIVELY REASONABLE.

### A.    Standard of Review

In evaluating a district court's imposition of a sentence, the Court first evaluates whether the district court committed a significant procedural error such as improperly calculating the advisory sentencing Guidelines range, failing to consider the § 3553(a) factors, basing a sentence on clearly erroneous facts, or failing to adequately explain the sentence imposed.  *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Perez*, 609 F.3d 609, 616 (4th Cir. 2010). Assuming no procedural error, the court next evaluates the substantive reasonableness of the sentence pursuant to an abuse of discretion standard.  *Gall*, 552 U.S. at 51; *Perez*, 609 F.3d at 616.  "Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard."  *Gall,* 552 U.S. at 51.  If the

-43-

district court's sentence is outside of the advisory Guidelines range, the Court "may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id.* This deference is due in part because "[t]he sentencing judge is in a superior position to find facts and judge their import [and] [t]he judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Id.* at 51. In reviewing the reasonableness of the sentence, "[the court] must 'take into account the totality of the circumstances, including the extent of any variance from the Guidelines range.'" *United States v. Morace*, 594 F.3d 340, 346 (4th Cir. 2010) (quoting *Gall*, 552 U.S. at 51). That the reviewing court might reasonably have imposed a different sentence is an insufficient basis for reversing the district court. *Id.*

### B. The District Court Committed No Procedural Errors When It Calculated the Sentencing Guidelines and Imposed a Variant Sentence.

In this case, the district court committed no procedural errors in sentencing the defendant. The district court ensured that the parties had reviewed the PSR, heard any objections to the PSR, appropriately determined that the defendant was

-44-

an Armed Career Criminal,[8] appropriately calculated the advisory sentencing

Guidelines range, heard evidence and oral argument regarding the appropriate

sentence, evaluated the § 3553(a) factors, and considered the appropriateness of the

advisory Guidelines range in light of the § 3553(a) factors.  JA 263-572.  This was

proper sentencing procedure.

The defendant nevertheless contends that the court's sentence was

procedurally unreasonable because the court cited the § 3553(a) factors, but "did

not meaningfully consider them as required."  Def. Br. 36-37.  In support of his

argument, he quotes small excerpts of the transcript, in an unpersuasive attempt to

diminish the court's explanation of the factors.  *Id.*  The record simply belies the

defendant's claim.  *See* JA 561-72.[9]  As noted in the fact section above, the court

methodically analyzed the § 3553(a) factors before imposing sentence and

explained its reasoning in applying the factors.  For example, with respect to the

nature and circumstances and seriousness of the offense, the court explained:

One might be tempted to look upon the offense in this case as simply

---

[8]    The defendant's arguments regarding the Armed Career Criminal finding are addressed below.

[9]    As an example of the supposed unacceptable brevity of the court's explanation, the defendant states that the court only mentioned the possession of ammunition conviction once.  Def. Br. 37.  However, that too is contradicted by the record.  JA 559-60, 563, 568, 570, 571, 572.

possessing ammunition and that's all there is to it. That is not the way
Congress sees it and that's not the way Congress sees it when a person
has a record like this defendant has, and that's why Congress has
provided a range of sentence that includes a sentence as high as life in
prison. So, I consider the sentence to be quite serious. Congress says
it's quite serious and has authorized judges to impose sentences of life
if the factors of 3553 are satisfied to justify that.

JA 568. Similarly, in terms of promoting respect for the law, the court explained:

Based upon the evidence that's before me from the trial, as well as
from the sentencing proceeding, it is clear to me that Mr. Moore has
no respect for the law, that virtually no sentence is going to be enough
to get his attention to promote respect for the law, that he's repeatedly
shown that both inside and outside of prison he has no respect for the
law and has engaged in criminal behavior both behind bars and
outside of prison.

JA 568-69.

The defendant also claims that the court's sentence was procedurally

unreasonable because the court did not make detailed findings of fact. Def. Br. 38.

The defendant contends that the court "merely conclud[ed] that Mr. Moore was

involved in murders, attempted murders and burglaries . . ." *Id.* Again, the

defendant's claim is at odds with the record, which shows that the court made

detailed findings about the violent acts the defendant had committed as outlined

above in the fact section. JA 562-65 (court discussing the Schwindler murder); JA

565-66 (court discussing the murders for hire and the credibility of the testimony

-46-

of Inmate One and Two).[10]

### C.    The Court's Imposition of a Sentence of Life Imprisonment Was Reasonable.

Given that the court's imposition of the defendant's sentence was procedurally sound – and the defendant's claims to the contrary are meritless – this Court next must consider the substantive reasonableness of the sentence under an abuse-of-discretion standard. *Gall*, 552 U.S. at 51; *Perez*, 609 F.3d at 616.

While the district court imposed the maximum sentence authorized by statute, it did so after careful consideration of all of the evidence before it both from the defendant's trial and the sentencing hearing. First, as the court noted, it might be tempting to underestimate the seriousness of the offense of conviction, viewing it "merely" as illegal possession of ammunition after a felony conviction. JA 568. However, as the court further explained, this is an offense for which Congress has authorized a maximum sentence of life for individuals with the defendant's criminal history. *Id.* "Congress thus expected that life imprisonment would be appropriate in some cases." *United States v. Little*, 61 F.3d 450, 454 (6th Cir. 1995) (affirming life sentence in Armed Career Criminal case). The facts

---

[10]    The defendant also contends that the district court erred in determining he was an Armed Career Criminal and in increasing his sentence accordingly. Def. Br. 36. That argument is addressed below along with the defendant's other constitutional arguments.

surrounding the defendant's possession of ammunition in this case are particularly alarming, given that the defendant obtained the ammunition through a straw purchase. Even more troubling is what the defendant was doing with firearms and ammunition around the time frame that he possessed the ammunition. The district court found that, both before and after he possessed the ammunition in this case, the defendant was involved in murders – the murder of Jason Schwindler in 2004 and murders for hire in 2007, among others. JA 563-67. That conduct, coupled with the defendant's well-documented and violent history while in BOP custody, caused the court to conclude that the defendant's background is "among the worst [the court has] seen in terms of the behavior that has been demonstrated by a preponderance of the evidence today, as well as his prior convictions." JA 570. The court further reasoned that the defendant was someone who has continuously flouted the law and shown no respect for the law both inside and outside of prison. JA 568-69, 570-71. The court explained that the defendant was involved in criminal activity in prison and has been involved in criminal conduct since he was released from prison, thus posing a danger to the public both inside and outside of prison. JA 568-69. Accordingly, the court found that virtually no sentence would be sufficient to promote respect for the law by the defendant. JA 568. The extent of the defendant's "horrific" background is crystallized by the fact that he served

-48-

the last portion of his ten-year federal drug sentence at ADX in Florence, Colorado – the BOP facility reserved for the system's most dangerous inmates. JA 705-40. Consequently, the court determined that a Guideline sentence of 235 months was "woefully inadequate" to protect the public and deter the defendant from future crime, and instead imposed a life sentence. JA 571-72. In imposing a life sentence, the court emphasized that the sentence in this case represented the exception, rather than the rule, stating "[t]his is one of those cases – it's a rare case indeed, but . . . I conclude that if there ever were a case that would justify the maximum amount that Congress has authorized, this is that case." JA 571. Because the totality of the circumstances demonstrate that the court's imposition of the maximum sentence was substantively reasonable, this Court should uphold the defendant's sentence. *See Little*, 61 F.3d at 453-54 (in pre-*Booker* case, affirming district court's upward departure from range of 188-235 months to a life sentence for defendant who was an Armed Career Criminal, based upon the defendant's violent history and the need to protect public); *see also Perez*, 609 F.3d at 619 (affirming upward variance in felon in possession case, where variance was based on defendant's involvement in violent street gang, the need to protect the public, and the outrageous conduct in the offense of conviction); *United States v. Hernandez-Villanueva*, 473 F.3d 118 (4th Cir. 2007) (affirming variance that

-49-

tripled guideline sentence in illegal reentry case based upon defendant's

membership in gang); *United States v. Diosdado-Star*, 630 F.3d 359 (4th Cir.

2011) (affirming "substantial" variance in illegal reentry/possession of counterfeit

alien card case based on totality of the circumstances).

### D. The Defendant's Constitutional Claims Regarding Sentencing Are Foreclosed by Settled Precedent.

The defendant attempts to attack the district court's sentencing of the

defendant by asserting a series of constitutional claims.  However, each of the

constitutional claims he raises is foreclosed by well-established law.

#### 1. The District Court Properly Relied upon the Undisputed Criminal Convictions Set Forth in the Presentence Report.

As explained above, the district court determined that, as a result of his prior

convictions, the defendant was an Armed Career Criminal pursuant to 18 U.S.C. §

924(e).  That section increases the penalty for a 922(g) offense to a mandatory

minimum of 15 years to a maximum of life imprisonment for a defendant with

three qualifying prior convictions.  The defendant argues that the district court

violated his Fifth and Sixth Amendment rights by sentencing him pursuant to 18

U.S.C. § 924(e).  *See* Def. Br. 57-61.  Notably, however, the defendant does not

dispute the *fact* of his prior convictions or whether those convictions constituted

predicate offenses under 18 U.S.C. § 924(e). Rather, the defendant only claims

that the district court unconstitutionally sentenced him under the Armed Career

Criminal Act by relying on prior convictions that were neither pled in the

indictment nor presented to a jury. *Id.* As the defendant acknowledges, in

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998), the Supreme Court ruled

that the fact of a defendant's prior conviction need not be presented to a jury and

proved beyond a reasonable doubt even though it could result in an increased

penalty. Such facts have been specifically exempted from the *Booker* holding.

*United States v. Cheek*, 415 F.3d 349, 352 (4th Cir. 2005). Moreover, this Court

has rejected the very same arguments that the defendant advances here, holding

that despite arguments that *Almendarez-Torres* has been eroded by subsequent

cases, it is still controlling law. *Id.* (holding that prior convictions used as the basis

for a sentence under the armed career criminal act need not be charged in

indictment or proven beyond a reasonable doubt).

    Apart from the fact that *Almandarez-Torres* forecloses the defendant's

argument, it is noteworthy that at the sentencing hearing, the defendant did not

object to either the *fact* of his prior convictions or whether those convictions

constituted predicate offenses under 18 U.S.C. § 924(e). JA 265-66. Thus, the

district court was never required to make any factual findings at all concerning the

-51-

defendant's prior criminal record, but instead relied on "the conclusive significance" of his record, *see Shepard v. United States*, 544 U.S. 13, 25 (2005), as set out in the PSR.  *See United States v. Thompson*, 421 F.3d 278, 285 (4th Cir. 2005) (sentencing judge entitled to rely on undisputed information in PSR that "bears the earmarks of derivation from *Shepard*-approved sources such as the indictments and state-court judgments from [defendant's] prior convictions").[11] Accordingly, this Court should reject any argument that the defendant's sentence was unconstitutional because the court sentenced him pursuant to the Armed Career Criminal Act.

>    2.    The Court's Consideration of Uncharged Conduct Did Not Violate the Defendant's Constitutional Rights.

The defendant also claims that the district court violated his Sixth Amendment rights by relying on uncharged conduct to increase his sentence beyond the applicable Guidelines range.  Def. Br. 15, 21-27.  The defendant contends that increasing his sentence based upon judge-found facts regarding

---

[11]    This Court has recognized that a defendant's failure to object to a factual issue at sentencing, such as a finding in a presentence report, can constitute an admission, if the factual issue is not one committed by *Booker* to a jury.  *See United States v. Milam*, 443 F.3d 382, 386 (4th Cir. 2006) (distinguishing between "factual issues committed by Rule 32(i)(3) to the court for resolution and those factual issues committed by *Booker* to a jury").  Here, there was no objection to the content of the PSR.  Therefore, the court properly relied upon the undisputed criminal convictions set forth in the report.  JA 264.

uncharged conduct violated his Sixth Amendment right to a jury trial.  Def. Br. at

15.  The defendant's Sixth Amendment argument is "nullified by clear Supreme

Court and Fourth Circuit precedent holding that a sentencing court may consider

uncharged and acquitted conduct in determining a sentence, as long as that conduct

is proven by a preponderance of the evidence."  *United States v. Grubbs*, 585 F.3d

793, 798-99 (4th Cir. 2009) (citing *United States v. Watts*, 519 U.S. 148, 157

(1997) and *United States v. Jones*, 31 F.3d 1304, 1316 (4th Cir. 1994)); *see also* 18

U.S.C. § 3661 ("No limitation shall be placed on the information concerning the

background, character, and conduct of a person convicted of an offense which a

court of the United States may receive and consider for the purpose of imposing an

appropriate sentence.").  Here, the record clearly demonstrates that the Court

assessed the credibility of the government's witnesses and found that the

government had proven the defendant's participation in numerous uncharged

murders and other violent acts by a preponderance of the evidence.  JA 563-67.

The defendant's attempt to recast *Apprendi* and its progeny as prohibiting

judicial fact-finding that increases sentences, even when those sentences fall within

the statutory maximum, is simply contrary to well-established Fourth Circuit

precedent.  As this Court noted in *United States v. Benkahla*, 530 F.3d 300, 312

(4th Cir. 2008), "[t]he point [of *Booker*] is thus that the Guidelines must be

-53-

advisory, not that judges may find no facts." *Grubbs*, 585 F.3d at 799.

Accordingly, a defendant may challenge a sentencing court's factual findings,

including the court's reliance on the findings, in appealing the reasonableness of

the sentence imposed. *Id.* "However, the court's underlying ability to make factual

findings regarding uncharged conduct does not violate the Sixth Amendment's jury

trial guarantee." *Id*.

The defendant's Fifth Amendment arguments are equally unavailing. First,

the defendant claims that the district court violated his Fifth Amendment due

process rights "by finding facts of the unrelated crimes, not beyond a reasonable

doubt, but only by a preponderance of the evidence." Def. Br. 15, 28-35.

However, this Court rejected that argument in *Grubbs*, 585 F.3d at 802-03. There,

the Court unequivocally stated, "[p]reponderance of the evidence is the appropriate

standard of proof for sentencing purposes." *Id.* at 803. The Court further

confirmed that the Supreme Court's decision in *Booker* had not changed the

applicable standard: "[w]e are thus persuaded that after *Booker*, the due process

clause does not require the district court to find uncharged conduct by a heightened

standard of proof before using it as a basis for determining a defendant's sentence."

*Id*. at 802.[12]

> 3.     The Court's Consideration of Hearsay Information, Which The Court Determined to Be Reliable, Did Not Violate the Defendant's Constitutional Rights.

The defendant also claims that the district court violated his constitutional rights by considering hearsay evidence at sentencing.  First, the defendant asserts that the district court violated his Sixth Amendment right to confrontation by considering hearsay evidence at sentencing.  Def. Br. 15, 49-53.   However, the defendant's argument in this regard is disposed of by this Court's recent decision in *United States v. Powell*, __ F.3d __, 2011 WL 1797893 (4th Cir. 2011), in which

---

[12]    The defendant appears to argue that the "*McMillan* exception," has some continued validity.  *See* Def. Br. 29-31.  However, that argument was clearly foreclosed by the Fourth Circuit in *Grubbs*:

> Whatever theoretical validity may have attached to the *McMillan* exception to a preponderance of the evidence sentencing standard, the Supreme Court's decision in *Booker* and subsequent cases applying *Booker* have nullified its viability.

585 F.3d at 801. The Court went on to explain, quoting the Third Circuit's decision in *United States v. Fisher*, 502 F.3d 293, 308 (3d Cir. 2007):

> In sum, because the Guidelines are now advisory and district judges are empowered to discharge their duties fully in the first instance, it is a logical impossibility for the 'tail to wag the dog,' as could occur when the Guidelines were mandatory.

*Grubbs*, 585 F.3d at 802.

-55-

the Court joined "every other federal circuit that hears criminal appeals" and held

that the Confrontation Clause does not apply at sentencing. *Id.* at *4 (listing

cases). The issue raised by the defendant is really one of reliability, that is,

whether the hearsay evidence considered by the district court was sufficiently

reliable such that it satisfies Fifth Amendment guarantees of due process. *Id.* And,

indeed, the defendant also claims that the evidence relied upon by the court at

sentencing was so unreliable that it violated his Fifth Amendment due process

rights. Def. Br. 15, 53-57.

Fourth Circuit law is clear on this point: a district court may consider any

relevant and reliable evidence, including hearsay, in fashioning a reasonable and

appropriate sentence. *Powell*, 2011 WL 1797893, at *4 ("Due process requires

that sentencing courts rely only on evidence with some minimal level of

reliability"); *United States v. Bowman*, 926 F.2d 380, 381 (4th Cir. 1991) (finding

district court properly considered uncorroborated testimony of informant). In

addition to the district court's determination that the information is reliable, the

defendant's due process rights are protected as long as he is given an opportunity

to rebut or explain the information presented at sentencing. *United States v. Love,*

134 F.3d 595, 607 (4th Cir. 1998) (noting that "there is no bar to the use of hearsay

at sentencing. 'United States courts have a long history of using reliable hearsay

for sentencing. The trial court may properly consider uncorroborated hearsay evidence that the defendant has had an opportunity to rebut or explain.'") (*quoting United States v. Terry*, 916 F.2d 157, 160-61 (4th Cir. 1990)).

The defendant argues that the court erred in admitting redacted grand jury transcripts and BOP records. Def. Br. 55. Specifically, he contends that the court erred in permitting Detective Blazer to testify regarding the grand jury testimony of various individuals. *Id.* He further contends that the Court erred in admitting the BOP records because "[n]o BOP personnel testified, nor did the government attempt to authenticate the records. Yet the court admitted them in their redacted form,[13] and used them to support its imposition of a life sentence." *Id.* The defendant's argument misses the point. The Rules of Evidence do not apply at sentencing hearings – the only issue is whether the records were reliable. Fed. R. Evid. 1101(d)(3); *United States. v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010) ("a sentencing court may give weight to any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy"). Here, the information the district court considered was sufficiently reliable.

The court's consideration of the sworn statements of individuals who

---

[13]    The reports were redacted to protect the identity of victims and witnesses.

testified before the grand jury was proper because sworn statements have an

inherent indicia of reliability themselves and the statements were corroborated by

other evidence. *See United States v. Morin*, 437 F.3d 777, 781 (8th Cir. 2006)

(upholding court's reliance on grand jury testimony at sentencing because

testimony has "indicia of reliability because it was given under oath and subject to

penalties of perjury" and was corroborated by other evidence); *United States v.

Williams*, 10 F.3d 910, 914 (1st Cir. 1993) (grand jury testimony is often

considered reliable hearsay evidence because it is given under oath, under penalty

of perjury). For example, in this case, the hearsay statements regarding the Carlos

Webb murder were corroborated by telephone records and recorded conversations

with the defendant. JA 489-92.

The BOP records the defendant references consist of internal BOP transfer

records, photographs, separation memos, incident reports, and findings of fact by

disciplinary hearing officers. JA 653-738. These records, which are routine

records maintained by the BOP, are inherently reliable for the same reasons that

business and public records are enumerated exceptions to the hearsay rule – they

are routine records relied upon by an entity in conducting business, deemed

reliable because the entity has an interest in ensuring their accuracy and

trustworthiness. Obviously, in order to maintain the security of its employees and

-58-

prisoners, BOP has a significant interest in identifying individuals responsible for violent behavior within its facilities, documenting misconduct, and issuing separation orders. And, while the court admitted all of the BOP records into evidence, the court made clear that it was relying on those incidents "for which [the defendant] was *found* to have been involved," meaning the court was relying on those incidents where a hearing officer had made a factual finding of involvement. JA 567 (emphasis added). On June 19, 2009, the defendant received notice of the BOP incidents when the government filed its sentencing memorandum. Notwithstanding ample notice of the BOP records, the defendant did not present any evidence to refute the information in those records. Given that the defendant was given an opportunity to refute the information, the court's consideration of the BOP records did not violate his constitutional rights.

The defendant further argues that the "proffered" evidence the court considered regarding the Schwindler murder was unreliable. The defendant's arguments regarding the evidence linking him to the Schwindler murder miss the point. The government did not "proffer" hearsay evidence; rather, it introduced the sworn testimony of witnesses who either testified at the Earl Davis trial or in the grand jury. JA 282-84, 293-96, 461-66; SJA 9-17, 20-111. In addition, the government presented exhibits that were introduced either at trial or through

-59-

Detective Blazer at sentencing. JA 461-66, 496-99; SJA 1-19, 112-121. The

evidence was corroborated by the defendant's own statement to Inmate One that

Davis was "holding water" for him, meaning not telling on the defendant. JA 356.

The defendant was on notice of the government's intent to rely upon this evidence

and was given an opportunity to present any information he deemed appropriate at

the sentencing hearing, which he elected not to do. Under these circumstances, the

court found the combination of such evidence reliable and persuasive – as it was

permitted to do under the law. JA 563-67; *Powell*, 2011 WL 1797893, at *4;

*Bowman*, 926 F.2d at 381.

In sum, because the defendant's constitutional claims are meritless, and the

court's sentence was both procedurally and substantively reasonable, this Court

should affirm the defendant's sentence.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY LIMITING THE DEFENDANT'S ACCESS TO INFORMATION OBTAINED BY IMPROPERLY ISSUED RULE 17(C) SUBPOENAS.

### A.    Standard of Review

The denial of an application for a Rule 17(c) subpoena is reviewed for an

abuse of discretion. *United States v. Fowler,* 932 F.2d 306, 311-12 (4th Cir. 1991).

"A trial court abuses its discretion when it acts arbitrarily or irrationally, fails to

consider judicially recognized factors constraining its exercise of discretion or

-60-

relies on erroneous factual or legal premises." *Uzenski*, 434 F.3d at 709 (internal

citations and quotations omitted).

**B.    The District Court Properly Exercised Its Discretion When It Limited the Defendant's Access to Information Obtained by Improperly Issued Rule 17(c) Subpoenas.**

Rule 17(c) provides that a subpoena may command an individual "to

produce any books, papers, documents, data or other objects the subpoena

designates." The rule also provides that the court may direct the witness to

"produce the designated items *in court before trial or before they are to be offered*

*in evidence*" and "when the items arrive, the court *may permit* the parties and their

attorneys to inspect all or part of them" (emphasis added). In *United States v.*

*Nixon*, 418 U.S. 683 (1974), the Supreme Court set out the elements which a

movant must satisfy to obtain a Rule 17(c) subpoena:

> Under this test, in order to require production prior to
> trial, the moving party *must* show: (1) that the documents
> are evidentiary and relevant; (2) that they are not
> otherwise procurable reasonably in advance of trial by
> exercise of due diligence; (3) that the party cannot
> properly prepare for trial without such production and
> inspection in advance of trial and that the failure to
> obtain such inspection may tend unreasonably to delay
> the trial; and (4) that the application is made in good faith
> and *is not intended as a general "fishing expedition*."

*Id.* at 699-700 (emphasis added). "[A] fundamental concern is that the subpoena

-61-

duces tecum is not intended to provide a means of pretrial discovery; rather its

primary purpose is simply 'to expedite the trial by providing a time and place

*before* trial for the inspection of subpoenaed materials.'" *United States v.*

*Richardson*, 607 F.3d 357, 368 (4th Cir. 2010) (emphasis in the original) (*quoting*

*Nixon*, 418 U.S. at 698-99).

The defendant argues that the court denied his access to subpoenaed records

that were vital to his defense at the sentencing hearing.  The defendant's argument

leaves the faulty impression that the defendant applied for and received Rule 17(c)

subpoenas from the district court, which the district court later quashed, denying

him access to records to which he was entitled.  Def. Br. 43-49.  In reality, rather

than apply for pretrial production of documents via the process outlined in Rule

17(c), defense counsel himself issued subpoenas, which requested the returns

pretrial.[14]  JA 813, 815-16.  As such, the court found that the defendant had issued

*de facto* Rule 17(c) subpoenas without proper authorization.  JA 813, 815-16.

Moreover, the district court expressed grave concerns regarding the security issues

implicated by the sensitive records, such as inmate separation orders of witnesses

cooperating against the defendant, that the defendant had requested.  JA 843.  The

---

[14]    In fact, the court only became aware of the subpoenas when one recipient
contacted the court out of concern for the sensitive information requested.  JA 811-
12.

district court expressed further concern that the defense sought the requested records in furtherance of a fishing expedition, as defense counsel stated that he wanted the records so that he could "go out and interview people."  JA 815, 829.

To remedy the unique circumstance presented by the defendant's unauthorized subpoenas, the court quashed the two subpoenas at issue to the extent that they required pretrial production.  JA 822, 842-43.  Consistent with the directive of Rule 17(c), the court inspected the records and concluded that the records contained "little, if anything" that would be useful to the defense.  In an abundance of caution, the court ordered the government also to review the records overnight and identify any information that would fall under the government's discovery obligations and/or be relevant to cross-examination.  JA 816, 836, 842.  The government complied with the court's request and provided some materials which might arguably be used to attack the credibility of Inmate One.  JA 238, 254, 260.  Thus, the defendant's claims relate solely to the court's refusal to make *all* of the subpoenaed records available.

The defendant defeats his own arguments regarding his entitlement to the remaining records.  The defendant clearly cannot satisfy the first and fourth prongs of the *Nixon* standard because he cannot show that the records are evidentiary in nature and relevant, and that the application is not intended as a general fishing

-63-

expedition. In terms of relevance, the defendant conceded to the district court that he issued similar subpoenas to other jails, which complied with his requests, but a review of the records revealed that they were of no utility to the defense. JA 231-32. Moreover, the defendant's brief supports the notion that the requests constituted a fishing expedition, as he argues that the records contained "vital" information, but cannot identify the type of information they purportedly contain. Def. Br. 48. Indeed, by his own admission, he could not establish the relevancy or evidentiary value of the records without reviewing them first. Def. Br. 47. Because the defendant cannot satisfy *Nixon*, the defendant could not have even obtained the Rule 17(c) subpoenas in the first place.

After finding the defendant did not lawfully subpoena the information under Rule 17(c), the court proceeded to review the records and determine if they should be disclosed to the defendant – which was generous considering the defendant's inability to satisfy the *Nixon* standard at all. As such, the court did not abuse its discretion because the defendant received more process than he was due via Rule 17(c); that is, he received some of the subpoenaed records even though he could not meet the *Nixon* standard. *Compare United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010) (finding no abuse of discretion in district court's denial of defendant's request for Rule 17(c) subpoenas where defendant could have "only

-64-

speculate[d] as to what the requested information would have shown" and "his requested Rule 17(c) subpoenas cast[ed] a wide net that betokens a 'general fishing expedition'").  In light of the review of the subpoenaed records by the court and the government, the disclosure of some possibly useful information from the records, and the defendant's failure to identify any relevant nondisclosed information, the district court's quashing of the subpoenas and limited disclosure of information from the records was not an abuse of discretion and did not violate the defendant's due process rights.[15]

## CONCLUSION

For the reasons stated, this Court should affirm the defendant's conviction and sentence.

Respectfully submitted,


Rod J. Rosenstein
United States Attorney


_____/s/_____
Emily N. Glatfelter
Deborah A. Johnston
Assistant United States Attorneys

June 23, 2011

---

[15]    It should be noted that the defendant attacked the credibility of Inmate One extensively, using his plea agreement, criminal history and reports of his statements to law enforcement officers.  JA 362-413.

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The United States respectfully suggests that oral argument is not necessary in this case.  The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

# CERTIFICATE OF COMPLIANCE

1.      This brief has been prepared using:

**WordPerfect, Times New Roman, 14 Point**

2.      EXCLUSIVE of the corporate disclosure statement; table of contents; table

of citations; statement with respect to oral argument; any addendum

containing statutes, rules, or regulations, and the certificate of service, the

brief contains <u>15,248</u> words; I understand that a material misrepresentation

can result in the Court's striking the brief and imposing sanctions.  If the

Court so directs, I will provide an electronic version of the brief and/or a

copy of the word or line print-out.


_____/s/_____
Emily N. Glatfelter
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 23, 2011, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF System, which will send

notice of such filing to the following registered CM/ECF user:

Michael E. Lawlor
Gwendolyn R. Waters
Lawlor & Englert, LLC
6305 Ivy Lane
Greenbelt, Maryland 20770


_____/s/_____
Emily N. Glatfelter
Assistant United States Attorney